THE CYPRUS.[1]

*(Circuit Court, E. D. Louisiana.  March 27, 1884.)*

1. CHARTER-PARTY—COMMENCEMENT OF LAY DAYS.
      Charterers had furnished cargo and asked and received bills of lading on December 7, 1880; and furnished more cargo on December 9th and again on December 11th, on which last day the ship was first fully prepared to receive cargo at all hatches. *Held*, that the action of libelants in furnishing cargo and receiving bills of lading therefor on December 7th ought to estop them from denying that the lay days for loading had then commenced.

2. SAME—WORKING DAYS.
      Where the charter provided that "eighteen working days, *Sundays excepted*," should be allowed, that provision shows that custom was not to control, and the exception of Sundays was the intent and meaning of the parties as to what should be considered working days, and therefore "rainy days" could not also be excepted.

3. SAME—TECHNICAL VIOLATION OF.
      A technical violation of the charter-party, otherwise fully executed, would not entitle either party to claim the full penalty named in the contract.

Admiralty Appeal.

*E. W. Huntington* and *Horace L. Dufour*, for libelants.

*James R. Beckwith*, for claimant.

PARDEE, J.  The original libel demands the recovery of $23,000, the estimated amount of freight under charter-party, penalty for alleged violations of the charter-party, to wit: (1) That the master of the ship claimed and exacted demurrage to which the ship was not entitled; (2) that cargo was stored in improper places, thereby causing loss to libelants by forcing them to provide additional cargo for the ship; (3) that the master refused to give draft, as per terms of the charter-party, for amount of excess of actual freight, as per bills of lading, over amount fixed by the charter-party; (4) The supplemental libel alleged that the steam-ship was liable to the libelants in the sum of $3,163.45, for advances, difference of freight, and commissions; (5) and for the further sum of $1,162.50, amount of demurrage illegally exacted.

1. As to the matter of demurrage, the charter party provides as follows:

"Eighteen working days, *Sundays excepted,* are to be allowed the said freighters (if the steamer be not sooner dispatched) for loading, and *to be discharged with all possible dispatch, as customary.* And ten days on demur-

---

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

rage, over and above the said lay days, at the rate of six pence per gross register ton per day."

The parties differ on two points: (a) when did the lay days commence, and (b) are rainy days to be counted?

(a) The proof is that libelants furnished cargo and asked and received bills of lading therefor on December 7, 1880; that more cargo was furnished on December 9th, and again on December 11th, on which last-named day was the ship first fully prepared to receive cargo at all hatches. It would seem that the action of libelants in furnishing cargo and receiving bills therefor on the 7th ought to estop them from denying that the lay days for loading had then commenced. The contract required them to furnish cargo in 18 working days from the time they commenced, and if they did that it was no concern of theirs what time was spent in loading and stowing without their fault. At any rate they ought not to be heard to deny that the lay days had commenced on the day they took for their own advantage the first bill of lading.

(b) As to the second point, the contract is too specific to leave anything to be determined by custom. By the contract the loading was to take 18 working days, (Sundays excepted,) and the discharging was to be with customary possible dispatch. The provision as to discharging shows that custom was not to control in the loading, and the exception of Sundays was the intent and meaning of the parties as to what should be considered working days. If the parties had not expressed themselves as to what exception should be made from working days, then I think there is no doubt both Sundays and holidays would have been excepted under the legal interpretation which have been given to the words "working days." But I know of no custom nor legal interpretation that can stand against the clear, express, unambiguous terms of a written contract. As a matter of fact in this case, legal holidays were excepted, as well as Sundays, by the master, in claiming demurrage. As to the rainy days, while, as I have shown, the contract includes them, the evidence does not show that the original parties to the charter had any knowledge of the alleged custom of this port in regard to them. See Chit. Cont. 142; 3 Kent, Comm. 260, note c; Renner v. Bank of Columbia, 9 Wheat. 587. And where the contract expressly determines the number of lay days, as it does in this case, the freighter is liable if the loading be not done within the stipulated time, unless the delay be caused by the fault of the ship-owner or his servant, "and accordingly it has been held that delays loading or unloading a vessel beyond her running days, if occasioned by frost or prohibition of a foreign government, or by custom-house regulation, or by unlawful seizure, or by the crowded state of the docks, or by default of the shippers, or by a casualty, cause, or accident other than the default of the ship-owner or his servant, are misfortunes which must fall upon the freighter." See 23 Amer. Law Reg. 155, and cases there cited. In this case it

seems to be clear that the ship was entitled to demurrage after the twenty-eighth day of December, 1880.

2. The evidence on the subject of stowing cargo in improper places leaves the matter in doubt, whether in this case there was such stowage. Drysdale, stevedore for libelants, and who loaded the ship, says: "All vessels that are chartered by the lump sum do not carry cargo in the thwartship bunker, the forepeak, the cabin, or the deck houses, but in all vessels that we have loaded where they carry cotton by the pound, we put the cotton almost every place where we can get a bale." And this sounds very probable as a matter of self-interest. But if it is conceded that in this instance there was such improper stowage, the evidence fails to show that it damaged or prejudiced libelants in any sum or amount. How much cotton was so stowed, or what the freight thereon, or how it affected the balance (excess or shortage) under the charter party are all left to conjecture. Of course, a technical violation of the charter party otherwise fully executed, would not entitle either party to claim the full penalty named in the contract.

3. As I find the evidence, there was nothing due the charterers for excess of freight as per bills of lading over freight fixed by the charter party. The returned bills of lading show that the account is the other way to the amount of £30 12s. 3d. Some of the evidence points to a claim by libelants that there should be deducted from the invoice weights on this side, some percentage for shrinkage in transit, and 4 per cent. off from the gross weights on this side is claimed. The performed bills show no deficit or reclamation, but a full delivery. If this claim of libelants is based on any custom, such custom is not proved. If it means that shippers are to be charged the full amount, and that 4 per cent. is to be deducted for the charterers from the earnings of the ship, it is hardly reasonable. If it means that the gross weights on this side are to be taken as fixing the freight received and earned, and an estimated deduction to be taken from weights on the other side in determining the freight allowed by the terms of the charter-party, that is not reasonable either.

4. The difference in freight being against the charterers, that item in the account claimed in supplemental libel is disposed of. The charter party stipulates, "the steamer to be addressed to the charterers' agents at the port of loading *free of commission.*" The claim made as under letters of owners of ship, Taylor and Sanderson, to Hayn, Roman & Co., of Liverpool, carried no right as to libelants, or as against the ship, and it appears, by the record, to have been settled by the parties outside of this case. There remains, then, of the claim made by the libelants in the supplemental libel, the amount of advances made for the ship, admitted to be $957.77, to which 2½ per cent. should be allowed, making a total of $967.34 as due from the ship to libelants at the time the original libel was filed. For this amount the master was obligated by the charter-party to draw

in favor of libelants on his consignee at port of discharge at 60 days sight. It seems that no specific draft for such sum was demanded; that no consignee had been selected; and that, in the numerous disputes between the parties as to the excess of freight, the proper clauses to be in the bills of lading, stowage of cargo, and demurrage, the demand, if made, was always so complicated with other matters as to receive no particular significance. At any rate, that amount represents the maximum amount of libelants' claims against the ship, and will be taken as their credit in making up account between the parties.

The case for the claimants, as made by the answer and cross-libel, are: (1) Denial of the valid assignment of charter party without owners' consent. (2) Claim for £30 12s. 3d. difference between freight stipulated and freight earned. (3) Claim for damages for illegal and oppressive seizure in the courts of the state and in the court *a qua*.

1. It seems to be too late to question the validity of the assignment as being without consent of the owners. The master recognized the libelants as legitimate assignees, reporting to them, receiving their freight, calling upon them for, and receiving from them advances and demurrage, before any question of the assignment was made. The ship and her owners ought to be estopped by this conduct of the master, all of which was in their interest and to their advantage.

2. The claim for difference of freight, as I have shown elsewhere, should be allowed.

3. The question of damages, by reason of the two seizures, presents more difficulty. That in the state court was oppressive and improvident, and the distinctive damages from that seizure should be allowed as far as proved; but aside from the trouble in giving bond to release the seizure and one day's demurrage, none are proved, for it seems that on the next day after that seizure the ship was libeled in the district court, and both seizures were released the next day thereafter. The seizure in the district court was oppressive for being so largely in excess of the amount due from the ship. It is true, that by the charter-party the amount advanced the ship was to be paid by a 60 days draft, but the parties had, as I have before shown, got into difficulty and confusion over conflicting claims, the ship had taken her business from libelants, and on the whole case I am not prepared to say that the libelants had not the right to protect themselves by libeling the ship for the real sum due them. They were not in such bad faith, nor was the master of the ship in such good faith that any beyond actual damages should be allowed. The proof is that claimants were at an expense of $2\frac{1}{2}$ per cent. to give the bonds exacted. The ship was delayed one day (January 3d) by seizure in the state court, and two days (January 4th and 5th) by the combined seizures. There is no proof of any other damages in the record. There is no claim by libelants for damages by cross libel and no proof of any. The record does not show, as alleged by proctor of libelants in his

brief, that the seizure in the district court could have been released for a less amount of bond than was given. I think that the claimants' side of the account should be stated thus:

| | |
|---|---|
| Difference in freight—short of contract, £30 12s. 3d. - - | $148 98 |
| One day's demurrage - - - - - | 232 50 |
| Two and one-half per cent. on $23,800, excess of bond exacted | 595 00 |
| Total - - - - - - - | $976 48 |

—which amount, it will be seen, overruns by a few dollars the credit due the libelants.

In this state of the case equity requires that a decree should be entered declaring all claims and demands between the parties compensated and extinguished, the costs of the district court to be equally divided between the parties, and as the decree of the district court was for a large sum against the claimants, the costs of appeal, including the costs of transcript, to be paid by the libelants. And it is so ordered.