PYMAN S. S. CO., Limited, v. ONE HUNDRED TONS OF KAINIT.

(District Court, S. D. Georgia, E. D. July 27, 1908.)

SHIPPING—DEMURRAGE—"WEATHER WORKING DAY."

Under a charter party for carriage of a cargo for delivery at Savannah, providing that the vessel should be discharged at the rate of 300 tons a "weather working day," where during the discharge it rained shortly before noon and nothing further was done that day, the cargo being of a character which would be injured by being wet, the charterer was entitled to the deduction of such day from the lay days, under the rule of the Savannah Board of Trade. following an old established custom of the port, providing that rain during working hours previous to noon shall prevent that day from counting.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 590. For other definitions, see Words and Phrases. vol. 8, p. 7426.

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

In Admiralty. Suit in rem for demurrage.

William R. Leaken, for libelant.
William W. Gordon, Jr., and Daniel Charlton, for claimant.

SPEER, District Judge. The Pyman Steamship Company, Limited, of West Hartlepool, England, is the owner of the British steamship Winifred. In a voyage from Hamburg to Savannah a part of the cargo was 100 tons of kainit. The charterer for this voyage was the

Hamburg-Amerikanische Packetfahrt Aktien Gesellschaft. The Winifred arrived at Savannah on the 6th of October, 1906, was entered at the custom house, and gave due notice of her readiness to discharge. Sunday intervening, the lay days of the ship began on Monday, the 8th, and on that date the charterer's agents, to wit, the Southern Shipping Company, and the owner of the kainit, the Southern States Phosphate & Fertilizer Company, proceeded to discharge the vessel. There is no complaint of any unlawful delay in this work until October 17th. On that day the steamship company claims that the charterer's agents and the owner of the kainit, at or about 11:30 a. m., ceased work, and did not, as they were bound to, complete the discharge of the stipulated average of 300 tons of cargo per weather working day, as per charter party and bill of lading. This cessation took place, in the language of the libel, "upon the completion of hold No. 4," by which we may presume that the pleader intended, when the unloading of hold No. 4 was "completed." For this half day demurrage is claimed. It is also claimed that the unloading of the cargo should have been completed by noon of the 23d day of October, and that at that time demurrage began to accumulate. The ship was not fully discharged, however, until the end of the 24th. For these delays, which are alleged to be unlawful, the Pyman Steamship Company claims the sum of $350 by way of demurrage, and has brought its libel therefor.

The clause of the charter party upon which the libelant relies is as follows:

"The steamer to be discharged at port of discharge at not less than an average of 300 tons a weather working day. If detained longer, demurrage to be paid 4 pence British sterling per ton gross register for every day so detained."

The gross tonnage of the Winifred was 2,794 tons. The clause in the charter party authorizing the lien in admiralty is as follows:

"Steamer to have an absolute lien upon the cargo for all freight, dead freight, and demurrage."

There is no dispute as to the dereliction of the respondent on the last day for unloading, viz., October 24th. It should have discharged the cargo by noon. It did not do this until the end of the day. It concedes that the libelant is entitled to recover for a half day's demurrage. The controversy rages as to the demurrage claimed on October 17th. There is no dispute that the work of discharging the cargo stopped anywhere from 11:30 to 12 o'clock on that day. The respondent, however, justifies this hiatus in the energies of its employés by reference to a provision of the Savannah Board of Trade, designed and formulated for the exigencies of that port. The rule is thus tersely stated:

"Rain during working hours previous to noon shall prevent that day from counting. Rain after noon previous to 4 p. m. shall prevent that half of the day from counting."

Now, the charter party does not undertake to define a "weather working day," or, in the meaning of the rule of the Savannah Board of Trade, a day the loss of which would count in the accumulation of

demurrage. The Circuit Court of Appeals of the Fifth Circuit, in the case of The India, 49 Fed. 76, 1 C. C. A. 174, has afforded a clear and practical definition:

"A day, otherwise a working day, when the weather would reasonably permit the carrying on of the work contemplated."

Considering this definition in connection with the facts of the case, we do not feel obliged to express an opinion as to the validity of the somewhat indulgent rule of the Savannah Board of Trade, above quoted. It is sufficient to say that the rule itself was not adopted to cause delay in loading or unloading the vessels engaged in the large commerce of that important port. It is more likely ascribable to the astonishing celerity with which the American citizens of African descent, who form a vast majority of the laborers along the wharves in Savannah, will disperse and disappear in the presence of a shower, and after such dispersal the impossibility of such a rally or assembly as would enable the stevedores to resume the work of discharging. Some of the witnesses testified to this reason for the rule. That it is well grounded upon fact will be recognized by all who know how easily the gravest responsibilities of life are cheerfully thrown aside by this light-hearted class of our population. According to the testimony of Mr. W. B. Stillwell, the president of the Savannah Board of Trade, of the secretary and other officers of the respondent, and of witnesses wholly disinterested, a custom similar to that prescribed by the Board of Trade has long existed in Savannah. It is that where any rain falls before the hour of 12, upon the option of the party interested the day will not count as a lay day, but it is held a nonweather working day. Certainly this was as well understood by the longshoremen and stevedores as by the shipping merchants of Savannah. There was no evidence to contradict the universality of this custom of the port, and, while it may not be held applicable to all cases, we may consider it along with the circumstances of this case, in order to ascertain whether or not the 17th is to be treated as a weather working day.

In the same connection we consider the character of the cargo being discharged. It consisted of manure salt and kainit, known as potash salts. It appears that these salts when dry are easily handled, but when wet have a tendency to dissolve and waste, and after being subjected to moisture, when they dry, the remnant hardens or solidifies to such an extent that it is frequently necessary to use dynamite in order to break up the mass so that it can be handled. For this reason it is contended by the respondent that it was improper to discharge this cargo in rainy weather. It insists that the 17th day of October, for which one-half day's demurrage was obtained, was rainy in the morning.

As usual in such cases, there is much evidence on both sides as to the fact of rain. The officers of this vessel and other vessels testified that there was no rain. For the respondent many witnesses have sworn that it was actually raining before the noon hour. Mr. T. Newell West, the acting stevedore for the Southern States Phosphate

& Fertilizer Company, who superintended the unloading of the Wini-fred, testified:

"I did not take the hatch off. About 9 a. m. I started to haul the ship It took half or a hour to haul her, and about 10 or 10:30, I think, it was finished, and it was raining so I knocked the men off."

He said many drops were actually falling at that time.

Mr. F. D. Screven, superintendent of the respondent's works, testified:

"I got down about half-past 10, and, immediately on getting there, it was raining then. So I put on a rain coat and took an umbrella, and kept it up until I got to the wharf, * * * and when I got there Mr. West was open-ing No. 3 hatch—just finished No. 4—and I gave instructions to stop work on account of the weather conditions."

The libelant's witnesses admit that it was misty and the sky was overcast. In the presence of this conflicting evidence the court pre-fers to accept the official report of the Weather Bureau at Savannah. The operator, Mr. H. B. Boyer, reports that the prevailing conditions were as follows:

"Cloudy and overcast all day, except between the hours of 12 noon and 1 p. m., when the sun shone for short periods. Misting rain began some time during the very early morning, and continued until 11:20 a. m."

Another cogent piece of testimony is a letter of Mr. Screven, written the day after that in question, viz., the 18th. It was addressed to the captain of the vessel. He wrote:

"In view of the fact that we made every reasonable effort to continue work on your vessel, but were forced to discontinue work due to rain in the forenoon, I do not agree with you that yesterday was a weather working day, nor do I agree with you that you can count it as a lay day."

This indicates clearly that the defense of the respondent was not the result of device or forethought. Otherwise, they exercised all reasonable diligence. To expedite the unloading of the vessel, they even, in violation of the laws of Georgia, worked on the 14th and the 21st, which were Sundays, when it was entirely optional with them whether they would work or not, so far as the rights of the chartered party were concerned.

For these reasons, I conclude that the libelant has not made out a case for demurrage so far as it relates to the claim for the 17th of October. The respondent admitting liability for one-half day of de-murrage, in the amount of $112.69, this will be allowed. This sum was tendered to the libelant, but not until the libel was filed. Judgment, therefore, will be rendered for the libelant in the sum of $112.69, with costs of the case.