## THE DRIEBERGEN.

### N. V. ZUID–HOLLANDSCHE SCHEEPVAART MAATSCHAPPIJ OF ROTTERDAM v. PENSACOLA MARITIME CORPORATION.

#### No. 6439.

Circuit Court of Appeals, Fifth Circuit.
Aug. 26, 1932.

Francis B. Carter, of Pensacola, Fla., for appellant.

John M. Coe, Philip D. Beall, and E. C. Maxwell, all of Pensacola, Fla., for appellee.

Before BRYAN, FOSTER and SIBLEY, Circuit Judges.

FOSTER, Circuit Judge.

Appellant filed a libel in personam to recover a balance of freight alleged to have been improperly deducted by appellee, as dispatch money, in making settlement under the provisions of a charter party. From the libel and charter annexed, the following material facts appear:

Appellant is the owner of the steamship Driebergen of 3,148 tons British register and of a capacity of 1,800 standards of lumber. On February 4, 1930, appellant and appellee entered into a charter party for the hire of the said ship to carry a full cargo of resawn

pitch pine lumber, to be loaded at Norfolk, Charleston, Tampa, and Pensacola, and delivered at Buenos Aires and Montevideo, the charterer to load the vessel, employ and pay stevedores, with the right to load at night, on Sundays and holidays, the steamer to be consigned to the charterers at each loading port and to be considered off charter while shifting ports, the charterer to pay wharfage, customhouse, tonnage and quarantine dues, consular fees for entrance and clearance, harbor master fees, and pilotage in and out of the ports of loading. The charter contains the following provisions as to lay days, demurrage, and dispatch money:

"Steamer to be loaded at the average rate of not less than seventy-five (75) standards per weather working day, Sundays and legal holidays excepted, unless used, such lay days to commence on the morning after the Steamer is ready to receive Cargo, and written notice given of same to Charterers or their Agents, and in case the Steamer is longer delayed by default of Charterers or their Agents, they shall pay demurrage at the rate of ten cents (10c) United States Gold per net register ton per running day for each and every day, and pro rata for every part thereof so detained. If sooner loaded the Steamer to pay Charterers or their Agents the sum of five cents (5c) United States Gold per net register ton per day despatch money for every day saved, including Sundays and legal holidays and pro rata for any part of a day saved. Charterers may finish loading on the day the Steamer is cleared at the Custom House without counting it as a lay day used, neither shall it count for despatch money. Saturdays are to count as full days. The demurrage to be payable day by day."

The allegations of the libel as to the movements of the vessel to and from the loading ports and the days consumed in loading the cargo are as follows:

"In pursuance of said charter said vessel arrived at Norfolk, Thursday, February 27, 1930, bunkered on said date and arrived at loading berth at 11 P. M. Respondent commenced loading vessel at 8 A. M., on Friday, February 28, 1930; finished loading at 5:30 P. M., and the vessel cleared and sailed for Charleston on the same day at 6 P. M. She was on her voyage to Charleston, Saturday, March 1st, and arrived there on Sunday, March 2d. Respondent commenced loading at Charleston at 7 A. M., Monday, March 3d, finished loading there Tuesday, March 4th, and the vessel cleared and sailed for Tampa, Florida. On Wednesday, March 5th, and Thursday, March 6th, she was on her voyage to Tampa, and arrived there on the morning of Friday, March 7th. Respondent began to load at 1 P. M. on the same day, Friday, March 7th, and continued until 4:30 P. M., when rain stopped the work. Respondent loaded Saturday, March 8th. March 9th was Sunday. Respondent loaded Monday, March 10th, from 8 A. M. until 11 P. M. On Tuesday, March 11th, the vessel cleared and sailed for Pensacola, Florida, arriving there Wednesday, March 12th, at 1:30 P. M. Respondent commenced loading at Pensacola at 2 P. M. on the same day, and continued loading through Thursday, March 13th. Friday, March 14th, and Saturday, March 15th, were rainy days—no work. March 16th was Sunday. On Monday, March 17th, it rained until 11:30 A. M. only, but the respondent loaded nothing that day. Respondent loaded Tuesday, March 18th. On Wednesday, March 19th, it rained until 11 A. M., but respondent loaded the balance of the day. Respondent loaded Thursday, March 20th and Friday, March 21st, but did not load on Saturday, March 22d, because it was a rainy day, nor on March 23d, which was Sunday. On Monday, March 24th, respondent loaded. It also loaded on Tuesday, March 25th, on which day the loading was finished and the vessel cleared and departed on her voyage to the discharging ports to deliver a cargo supplied by respondent; that there were no holidays between February 27th and April 15th, 1930, but there were seven Sundays between those dates, to-wit: March 2d, March 9th, March 16th, March 23d, March 30th and April 6th and April 13th."

The charter provides for 24 lay days. In paying the freight appellee assumed that 20½ days had been saved to the ship, and deducted dispatch money accordingly. Appellant contends that not more than 12½ dispatch days had accrued.

Appellee excepted to the libel on the ground that it was entitled to deduct from the days used for loading a notice day and a clearance day at each port, 8 in all, that its calculation of 20½ days for dispatch money was correct, and that the libel disclosed no cause of action. The District Court sustained the exception to the extent of holding that the respondent was entitled to deduct 4 notice days, but overruled it as to the claim for deduction of the clearance days. An answer was then filed, admitting the allegations of the libel except as to the calculation by appellant of the dispatch days. Later, by leave of court, appellee filed an amended answer, add-

ing the following allegations: "That the clearing of the vessel on the last day of loading instead of upon the following day involves such additional overtime-work and expense to the charterer, with no resulting benefit unless it thereby saves a used lay day with resulting despatch money; all of the advantage of such clearance otherwise being only to the ship owner in enabling an earlier sailing; and the purpose of the clause in the charter party providing that 'charterers may finish loading on the day the steamer is cleared at the custom house, without counting it as a lay day used, neither shall it count for dispatch money,' is to give this opportunity of additional despatch money to the charterer as an inducement to him to incur this additional labor and expense, in order that the ship may profit by the earlier sailing. And, further, as the respondent is informed and believes and therefore avers, this interpretation of the clause allowing an additional despatch day to the charterer if he clears the ship on the last day of loading, is almost universal among both shippers and ship owners, the denial of it by ship owners being of comparatively rare occurrence."

An exception of libelant to the additional paragraph was overruled. The case was then submitted on the charter and the pleadings. On this hearing the District Court agreed with all the contentions of appellee. A decree was entered in favor of respondent dismissing the libel. This appeal followed.

There are few reported cases dealing with the subject of dispatch money. Owing to the great difference in the terms of the charter parties considered in these cases, it would serve no good purpose to review all of them. So far as we are aware, the only cases in point are The Twilight (D. C.) 194 F. 926; and The Muirfield (D. C.) 174 F. 75. These sustain the contentions of appellant. As the latter case was decided by Judge Sheppard, who presided in the District Court in this case, and he has receded from his former opinion, it may not now be considered an authority.

■ The rule is well settled that a charter must be construed according to the intent of the parties as manifested by the whole instrument rather than by the literal meaning of any particular clause taken by itself. Crossman v. Burrill, 179 U. S. 100, 21 S. Ct. 38, 45 L. Ed. 106.

■ We may first dispose of the contention that the charterer was entitled to a notice day of 24 hours at each port, which, if used, was free time. The ship was off charter in shifting ports, and therefore in the custody of the agents of her owner. The charterer was required to designate the loading berth at each port, but, having no control over her navigation, could not be charged with knowledge of her arrival without actual notice. Notice implies notice of readiness to load. She might be at the loading wharf and yet, for many reasons, not ready to load. Preparing the ship for loading was the duty of her master. Considering this, we think the charterer was entitled to written notice, according to the terms of the charter, at each loading port. It does not appear that written notice was ever given. But, as the charterer had actual notice at each port, and loading began as soon after arrival as possible, written notice was waived. The Cypress (C. C.) 20 F. 144; Washington Marine Co. v. Rainier Mill & Lumber Co. (D. C.) 198 F. 142. This is not disputed by appellee.

■ The lay days did not start with the beginning of loading. The charter definitely fixes the beginning of the lay days at the morning after arrival. This does not mean an arbitrary day of 24 hours. The time used on the day of arrival, with consent of the master, was free, but the lay days began on the morning of the calendar day after arrival. Elder Dempster S. S. Co. v. Earn Line S. S. Co. (C. C. A.) 168 F. 50.

■ The agreement for dispatch money is plain. While the ship was loaded at four ports, there was only one voyage. The obligation to pay dispatch money could not arise until the ship was loaded for the voyage at the last port. When this loading was completed, the rights of the parties were fixed with regard to dispatch money. The charter fixes the lay days at 24 weather working days, based on the rate of loading, and provides that, if the ship is sooner loaded, dispatch moneys shall be paid for every day saved, including Sundays and legal holidays. The days saved for which dispatch money was due were the lay days remaining unused after loading was completed, plus the Sundays and legal holidays necessarily included in the period over which they would have extended, if the ship were kept in port until they were exhausted. Cf. South American Metal Co. v. Kjoge (C. C. A.) 12 F. (2d) 562. As these days were not to be used at all, no question arises as to Sundays and holidays used or weather working days.

The principal dispute arises over the construction to be given a provision of the char-

ter, above quoted, relative to the effect of clearing upon the last loading day, which for convenience we repeat: "Charterers may finish loading on the day the Steamer is cleared at the Custom House without counting it as a lay day used, neither shall it count for despatch money."

The contention of appellee is this: That the sole purpose of providing for dispatch money is to expedite the sailing of the ship; that, although the ship may be loaded on a clearance day, it is not to be considered as a used lay day; that therefore the lay days remain the same as if the loading had been concluded the previous day, in which event the clearance day would be a dispatch day; that the clause "neither shall it count for dispatch money" is inconsistent with the rest of the sentence, renders the whole sentence meaningless, and nullifies the provision for the awarding of dispatch money for each day saved; that, applying the rule of construction applicable to all contracts, where the contract contains two inconsistent provisions, the earlier provision should govern; that therefore the clause should be disregarded.

The charterer relies upon the allegation of the amended answer above quoted as much as upon the wording of the contract. As apparently this was given effect by the District Court, we may consider it. When a case is submitted on the pleadings, the facts well pleaded in both the libel and the answer are deemed to be true. However, this refers to concrete facts from which the court may form his own conclusions. The paragraph added to the answer by amendment, above quoted, is a mere conclusion of the pleader without probative force. If taken as true, so far as stating the customary construction of other similar contracts by the parties, that custom would not be binding on either the parties in this case or the courts.

It is argued by appellee that the advantage to the vessel of clearing on the last loading day is so great, while the charterer is put to so much additional inconvenience and expense, with no resulting benefit, that reasonable construction would require that the provision as to the clearance day used not being counted for dispatch money should be disregarded. The argument is not persuasive. The clearance of a vessel at the custom house is a matter of simple routine. If an ordinary working day were used for clearance, as in this case, it is inconceivable that the charterer would be put to additional expense or inconvenience. When a vessel is cleared for a foreign port, both the shipper and the master

have duties to perform. Each must submit a verified manifest before clearance is granted. 46 USCA §§ 91, 92. But these statutes are liberally construed by the customs authorities. The ship may be granted clearance on an incomplete manifest, and the complete manifest may be presented within 4 days thereafter. The ship may also remain in port for 2 days after clearance without an amendment of the clearance and without taking out a new clearance. Article 172 (a) (e); article 164 (d) Customs Regulations, 1931. This would give ample time to complete loading and prepare full manifests. After the cargo is brought alongside, it should not be difficult for either the shipper or the master to determine with reasonable certainty how much will be actually loaded. Incomplete manifests could readily be made up within the usual business hours.

It is an advantage to the vessel to be allowed to clear on the last loading day. Doubtless, all ships do so, if possible. By doing so she may sooner complete the voyage and be available for other engagements. But earlier completion of the voyage is also an advantage to the shipper. Furthermore, the charter provides for both demurrage and dispatch money. If the lay days had been exhausted, clearance on the last loading day would save the charterer a day's demurrage, double the amount of dispatch money. The charterer might also save wharfage and other port dues, which it was bound to pay at the loading ports in this case. The advantages of clearing on the last loading day, under the provisions of the charter here involved, are certainly equal to both charterer and owner, if they do not predominate in favor of the charterer.

It is true, as contended by appellee, dispatch money is a premium paid by the vessel for days saved that may be used in completing the voyage. However, dispatch money arises purely from contract, and is not awarded as a quantum meruit. The charter provides for both demurrage and dispatch money. The clearance day clause applies to each. It is plain that under the terms of the charter there was no intention that the charterer should escape demurrage in one situation and obtain the advantage of dispatch money in the other. The provisions are mutual and equitable. Clearance requires the concurrence of both the shipper and the master. Either would be well within his rights in refusing to execute clearance papers until the ship was completely loaded. If the master declined to clear on the last loading day,

the charterer might lose one day's dispatch or incur one day's demurrage. If both agreed to clearance, the charterer would be no worse off as to dispatch money, and might save a day's demurrage. To illustrate. If the ship finished loading on the last lay day, there would be neither demurrage nor dispatch. If the lay days had been exhausted and the ship finished loading and cleared on the next day, the charterer would save one day's demurrage. If, say, 12 lay days had been used, the ship finished loading on the next day and cleared the following day, there would be 13 lay days used and 11 dispatch days left. If, in the same situation, the ship finished loading and cleared on the 13th day, and that day was deducted in computing dispatch money, the charterer would still be entitled to 11 days' dispatch. It follows that a fair and reasonable construction of the charter party requires that the clearance days used for loading should be considered lay days used, for the purpose of computing dispatch money.

We are unable to agree with the calculations of either appellant or appellee as to the amount of dispatch money earned. Appellant has not given credit for the Sundays that must be considered as days saved, while in computing the lay days used appellee has improperly deducted too much time for notice days and clearance days. On this question our conclusions are as follows:

The lay days began at each port on the morning of the next day after the day upon which the vessel arrived. The days used for both loading and clearance are to be considered as lay days for the purpose of computing dispatch money. It follows that the lay days began at Norfolk on the morning of Friday, February 28th. There was one lay day at Norfolk. They began again at Charleston on Monday, March 3d, and continued through Tuesday, March 4th. There were 2 lay days at Charleston. The vessel arrived at Tampa on Friday, March 7th. Loading began at 1 p. m. on that day but this day must be considered free time. Therefore, at Tampa, Saturday, March 8th, was the first lay day and Monday, March 10th, was the second lay day. Monday should be considered only one day, although the vessel loaded from 8 a. m. to 11 p. m., as the charterer had the right to work at night. The vessel cleared from Tampa on Tuesday. No loading was done that day, so it is not to be considered. There were two lay days at Tampa. The vessel arrived at Pensacola on Wednesday, March 12th, and loaded from 2 p. m. on that day. This was also a free day. The

lay days began at Pensacola on Thursday, March 13th. Because of rain and an intervening Sunday, loading was not resumed until Tuesday, March 18th. Only part of the day was used on Wednesday, March 19th, but full days were used on Thursday, March 20th, and Friday, March 21st. Again, because of rain and another intervening Sunday, loading was not resumed until Monday, March 24th. Loading for the voyage was completed Tuesday, March 25th, on which day the ship cleared and sailed. For the purpose of computing dispatch money earned, the total lay day time actually used at Pensacola was 6 days and part of the day on Wednesday.

█ The lay days at each port are to be added together to determine how many are to be considered used. It is apparent that at least 11½ lay days were consumed in loading. This leaves for consideration Monday, March 17th, at Pensacola, when it rained until 11:30 a. m., but no work was done. The lay days were weather working days. A weather working day is a day otherwise a working day, according to the custom of the port, upon which the weather permits loading. The India (C. C. A.) 49 F. 76; Pyman S. S. Co. v. One Hundred Tons of Kainit (D. C.) 164 F. 364. The lay days and dispatch days are to be computed pro rata. It is not shown what were the ordinary working hours at any of the ports of loading nor what the custom of the port might be if it rained substantially all morning. We are therefore unable to determine whether this day was to be considered a lay day. If it were a weather working day under the custom of the port, it should be considered the same as a lay day used for the working portion whether loading was done or not. The same question arises as to Wednesday, March 19th, at Pensacola. It might be only a half day or more than a half day, as work started at 11 a. m., according to the custom of the port. Where the charter provides for demurrage and dispatch money pro rata for every part of a day, it is to be calculated by hours and minutes. Perhaps on a new trial the parties may agree as to these days. If not, evidence may be taken.

█ The charterer was entitled to dispatch money for Sundays intervening in the lay day period saved. The ship cleared from Pensacola on Tuesday, March 25th. Regardless of what may be decided as to how Monday, March 17th, and Wednesday, March 19th, are to be considered, the period over which the lay days saved would have extended would include the Sundays, March 30th and April 6th. In no event would it extend

to include Sunday, April 13th. Appellee is entitled to charge for 2 Sundays but not for 3.

From what has been said above it follows that the judgment appealed from must be reversed and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.