## THE GEORGE SHIRAS.

### JUTTE et al. v. THE GEORGE SHIRAS.

(Circuit Court of Appeals, Third Circuit. May 4, 1894.)

TOWAGE.

  Libelants' barges in tow of respondent's tug were wrecked in a narrow channel in the Ohio river. Proper navigation of this channel required that the tow should be allowed to drift through it with the current, the tug backing, meanwhile, to keep control of it and steer it. Witnesses from the tug testified at the trial that this maneuver was undertaken, but that a severe gale blowing at the time turned the whole tow around so that the tug was helpless, and the current cast the tow on the bank. Witnesses from another boat testified that at the time of the accident the tug was going ahead; and it was shown that immediately after the accident the captain of the tug admitted that it was caused by the tug's going ahead, owing to the engineer's mistaking the signal bells. *Held*, that the accident was due to the negligence of the tug.

Appeal from the District Court of the United States for the Western District of Pennsylvania.

This was a libel by C. Jutte & Co. against the George Shiras. There was a decree in favor of respondent, and libelants appeal.

Knox & Reed and Edwin D. Smith, for appellants.

D. T. Watson and S. C. McCandless, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and GREEN, District Judge.

GREEN, District Judge. The libel in this case was filed to recover the value of two coal boats and their cargoes, which became a total loss, on their voyage from Pittsburgh, Pa., to Louisville, Ky., at a point on the Ohio river known as "Deadman's Island." The boats and cargoes were the property of the libelants and appellants. As owners, they had made a contract with the owner of the steamer George Shiras for the towage of these boats, and at the time of the loss the Shiras was engaged in performing such contract. The allegation of the libelants is that while "on this voyage down the Ohio river from the port of Pittsburgh to the port of Louisville, under said contract of towage, and at Deadman's island, the said steamboat [the Shiras], through the negligence of its master, pilot, engineer, and crew, or some thereof, ran the said two boats upon the shore bar, and the said two boats and their contents became and were a total loss." It appears from the testimony that the Shiras, having in tow five coal boats and a barge, left Pittsburgh between 9 and 10 o'clock of the morning of February 7, 1890. The tow itself seems to have been properly made up, and the Shiras was in the position usual and customary for towboats on this river, with all of the boats making up the tow in front of her. At the time when the Shiras left Pittsburgh the wind was light, and there was some snow falling. She arrived between 1 and 2 o'clock in the afternoon at Deadman's island. The wind had increased in velocity, and the snow continued falling, but it nowhere appears that the range of vision was seriously affected or diminished

thereby. Deadman's island is about 14 miles below Pittsburgh. It lies at a bend or curve in the river, narrowing the channel in width to about 100 yards, forcing it over toward the northerly side, and causing the current to set over, with some velocity, upon the main shore. It appears that, while this is not especially a dangerous part of the river to navigate, it is not an easy place to run, and it always has to be "run very carefully" by the tows going down. It is considered the better way, for safety, while passing, to "flank," as it is termed. "Flanking" is simply permitting the tow to float down stream with the current along the channel, without any assistance from the towboat, which, in fact, instead of propelling the tow, at this point controls its movement by reversing its engines, and backing with such speed as will give to it the control of the tow, without overcoming entirely the force of the current. At this place on the river, unfortunately, this tow ran upon, or was cast upon, the shore, and the consequent injury and loss to the boats resulted. The libelants allege that the Shiras failed to flank the tow, as she should have done, and that at, or just immediately before, the time the wreck occurred, she was actually and positively propelling the tow ahead, causing the wreck; and this mismanagement is the negligence charged against her. Upon the other hand, the respondent insists that no negligence should or can be alleged truly against the Shiras; that the true explanation of the accident is to be found in the fact that the wind grew stronger as the day advanced; that, when the Shiras arrived at Deadman's island, it was blowing in such gusts, and with such force and velocity, that although she tried to flank, and did put herself and her tow in proper position to do so safely and successfully, yet she was caught by the gale, and blown completely around, so that her stern was down stream, and so great was the power of the wind that she could not overcome its effect, striving as strongly as she could, and so the tow drifted upon the north shore. In other words, she interposes the defense of a vis major, which, she asserts, was the natural and proximate cause of the injury. A loss is said to be caused by vis major when it results immediately from a natural cause, without the intervention of man, and could not have been prevented by the exercise of prudence, diligence, and care, and the use of those appliances which the situation of the party renders it reasonable that he should employ. Story defines "vis major" to be any irresistible, natural cause, which cannot be guarded against by the ordinary exertions of human skill and prudence; and this definition is approved by Chief Justice Cockburn in Nugent v. Smith, 1 C. P. Div. 437. Thus, a storm of unusual and extraordinary violence, a sudden gust of wind, and a tempest, have been held to be examples of vis major. And under such circumstances, if an injury occurs, he who is in the charge of the thing injured is within the rule which gives immunity from the effects of such an "act of God," if he can satisfactorily show that he used all known means to guard against the accident to which prudent and experienced men usually, in like circumstances, have recourse. If, then, it be proved, in this case, that this accident which caused

the loss of the coal boats and cargo was the immediate result of an unusual, extraordinary, and violent gale, amounting in fact to a quasi tempest, and if it be true that experience and prudence could not have guarded against the disastrous consequences, the plea of the respondent must prevail, and the Shiras go free. What, then, was the character of the storm of wind and snow on the day of the accident, at the place in question, and what were the efforts of the master and crew of the Shiras to guard the tow from impending disaster?

As is not unusual, the testimony on these points is not in harmony. However, without repeating in full the statements of the several witnesses, and having regard, at first, to the testimony offered by the respondent only, it seems that from official observations taken at the United States weather bureau at Pittsburgh, the day in question,—February 7, 1890,—was, in the early morning, exceedingly cloudy, doubtless presaging the sleet, snow, and rain which soon commenced falling; the wind blowing from the north, but early in the afternoon veering around to the southwest, from which point it continued to blow on into the evening. The wind was brisk from 11 o'clock in the forenoon until perhaps 2 o'clock in the afternoon, the average velocity for the day being about $8\frac{1}{2}$ miles per hour. Between 1 and 2 o'clock the highest velocity was registered, which was 20 miles per hour; but this, the officer in charge of the bureau, declared was a "gust," which lasted apparently a short time,—only three or four minutes, in fact. Between 12 and 1 o'clock the wind was steady, and its velocity about 14 miles an hour. Down at Deadman's island the same condition of weather and wind seems, apparently, to have been experienced by the Shiras and her tow. That condition is variously described by the witnesses. Thus, one speaks of the day as a "pretty fierce one," but "not too bad to navigate." He declares that the "weather was worse at Deadman's than anywhere else;" that it was "blowing very hard, and snowing;" that "it kept getting stronger, and blew the hardest three-quarters of a mile above Deadman's." Another says "it approached a storm;" and another illustrates the force of the wind by describing the "whitecaps" on the river; and characterizes the weather, generally, by calling it "a pretty blustery night." And still another says the wind got higher, as the day opened, and blustery, and blew harder at some times than at others. It may be remarked, in passing, that while the snow storm is generally alluded to in their description of the weather by the witnesses for the respondent, it may be eliminated wholly from this case, as of no importance whatever. There is not a scintilla of evidence, direct or inferential, that the falling snow in any wise contributed to the accident, or formed in the slightest degree a component part of the asserted vis major. The statements quoted above comprise all the material testimony offered by the respondent to sustain this defense. It is admitted that the burden is upon him to satisfy the court affirmatively of the sufficiency of the explanatory excuse. Has this been done? If this evidence be given the most liberal effect, it simply tends to prove that a high wind was blowing at Dead-

man's island about the time the Shiras arrived there. A wind which was perhaps averaging 14 miles per hour; or, to put it a little more favorable to the respondent, a wind which, for three or four minutes, blew at 20 miles per hour. Can it be seriously argued that the witnesses have described a storm of unusual and extraordinary violence, or a tempest? It is true that several of the witnesses declare that the wind blew so strongly that it forced the Shiras around so that her stern was down stream. But the difficulty with the whole defense, as made by the respondent, is that this impending danger was clearly foreseen—the velocity of the wind plainly noticeable—some time before the tow reached the place of danger, and while it was under complete control of the Shiras; and yet no alarm is expressed, no special or extraordinary maneuver performed, no precaution taken by the master of the tug to guard against the peril which now seems to loom up so threateningly as the pregnant cause of this disaster. On the contrary, the customary preparations, only, for flanking are calmly made, and the tow put in position to drift down the channel, as if the wind was but a balmy spring breeze. The engineer, indeed, is notified to increase, if possible, the "head of steam," but at what time is not made clear. No call to the lookout that danger was near, and extra watchfulness required. The regular pilot goes off quietly from his post to his dinner, and a substitute, who does not wholly escape some sharp personal criticism, takes the wheel. And all this in the face of a vis major. One or two explanations may be given: Either the master and crew were clearly guilty of gross negligence, if the danger was as apparent as the respondent's witnesses have testified, or the danger did not exist in so threatening or effective a form that it became a vis major. A careful study of all the evidence in the cause leads to the latter as the true explanation. Just as the Shiras was approaching Deadman's island, another steamboat—the Pierpont—happened to be coming up the river, and was near the same place. The boats were distant from each other about four or five hundred yards when the Shiras was first noticed by the persons on the Pierpont. From the time when the Shiras was first seen, until the accident, she was in plain view. In the pilot house of the Pierpont were Capt. McDonald, Capt. Hamilton, of the Pierpont, and Mr. Douds, the pilot, at the wheel. Capt. McDonald was not on duty, but simply riding as a passenger. He says he saw the Shiras when she was more than half a mile away; that it was about 1 o'clock, after dinner, and the view not obstructed by fog, or anything of that kind. The wind was "blowing very light, at that time. There was no wind to interfere with any person in navigating the river." Capt. Hamilton, who is an experienced steamboat captain or pilot, in describing the weather, says "that the day had been very windy in the morning, but was not windy at the time of the accident; that the wind then was not blowing violently, or in gusts; and that in his judgment the wind had nothing whatever to do with the accident in question." Mr. Douds, the third occupant of the Pierpont's pilot house, testifies that the wind came down the river in a little gale; that the storm had been heaviest in the forenoon; that it was blow-

ing in the afternoon, but not storming; and that the wind was not strong enough to interfere particularly with navigation. Now these are statements of witnesses as thoroughly disinterested as the witnesses for the respondent; and it would be difficult, in comparing this testimony with the testimony of the other witnesses,—supposing no other fact to intervene,—to say decisively upon which side was to be found the greatest weight. The statements pro and con lie very evenly in the balance; but this equality in weight, this lack of preponderance on one side or on the other, is fatal to the defense. The burden is upon the respondent. Preponderance of testimony must be affirmatively apparent on his side of the scale. Failing to appear, the burden cast upon him by the law is not successfully borne,—its demands are not complied with. But there is an independent and intervening fact which does turn the scale. It is this. Shortly after the wreck occurred the captain and the engineer of the Shiras gave their account of how and why it happened; and yet, strange as it now seems, in view of their later statements, neither charged the weather or the wind as the cause. Other, and totally different, reasons were then assigned by both of these officers as fully accounting for the result. If the wind, by its gusts and force, drove this tow ashore, what could be more truthful, not to say natural, than to put the blame upon it. Would not these officers have described, in the terse but graphic language of the rivermen, the overwhelming gale which paralyzed all their efforts to save their tow from destruction? Vis major successfully conceals many acts which might be regarded, otherwise, as careless or negligent. It relieves from all criticism or complaint. It condones, if it does not justify, the failure to avert the disaster. Surely, such a cause, if it existed, would be confidently and clearly brought forward to account for the loss by those who, for lack of such excuse, might be condemned. But these officers of the Shiras, when asked to explain how the accident happened, never hint, even, that it was the wind or storm which forced the tow ashore. Can it, in the face of such silence, be believed now that such was indeed the cause? But the testimony does not leave this matter wrapped in difficulty, to be solved only by inferential deduction. Facts are testified to, which, unless the grossest perjury has been committed, thoroughly explain the accident. It has already been stated that as the Shiras was making her way down the river, at Deadman's island, another steamboat, the Pierpont was coming up. Separated, when first observed, by perhaps half a mile, these boats gradually approached each other, and were quickly in clear view. When the accident occurred they were not more than 75 yards apart. The peculiar movements of the Shiras attracted the attention of those upon the Pierpont, and first that of the captain, McDonald, who was, as has been stated, in the Pierpont's pilot house. He immediately called the attention of Mr. Douds, the pilot, to them. He said to him, "That man [referring to the captain of the Shiras] is going ahead in the steamboat, and he will kill her, if he don't stop," and, as the Shiras continued to go ahead, he suggested to Mr. Douds that he had better stop the Pierpont, and sound his whistle, to call the attention of

the other pilot to what he was doing on the Shiras. He then testified that Mr. Douds did stop the Pierpont, and sounded several short whistles, to call attention of those on the Shiras to their position; but the Shiras did not stop, and never did stop until her head struck the rock. Capt. Hamilton, also in the pilot house of the Pierpont, testified as follows:

"Q. Tell us what occurred after you saw the Shiras. A. Well, what made us notice her was, when they were coming out at the head of the island, they started ahead on her, and Captain McDonald made the remark, something about her going ahead, and I think I said to him, 'I suppose they have flanked too much, and maybe they are going ahead to counteract their flanking.' Captain McDonald remarked something about them going ahead, and going to kill her. Q. Well, what happened? A. Well, we came on, and stopped our boat, or ran slow, to see where she would go, so that we would know where to go to get out of the road. The Shiras kept on going ahead, and McDonald told the pilot to toot his whistle, to call his attention to what he was doing. He did so, but the Shiras kept on going ahead until about the time she struck. Could not say positively whether she stopped before she struck, but stopped about that time. I think she was backing before the tow went out on the bank."

And again, on cross-examination:

"Q. She was going ahead? A. Yes, sir. Q. At any considerable head of speed, or slowly? A. Going ahead as hard as she could."

And Mr. Douds, the pilot of the Pierpont, gave the following evidence:

"I first noticed the Shiras. I was on watch, and, as I have stated,—about it being a narrow place in the river,—I wanted to pass the Shiras, and for that reason was watching her movements. She was stopped, and then started ahead; and I thought perhaps she had stopped her headway too much, and was perhaps drifting on the bar. But she continued to go ahead. The boat did not stop; boat did not stop; boat going ahead, and the boat was crossways of the river. Then she came ahead stronger, and full head; and then I seen something was wrong, and began to sound the whistle,—sounded the whistle two different times, to draw their attention, as I thought they were likely mistaken, and that the boat was going into the bank. She continued to go ahead until the coal boat struck the bank, without stopping."

And again:

"Q. When you first noticed the Shiras, what was her position in the river? A. Well, she was what we would say 'crosswise.' Q. Quartering? A. Yes, sir. Coming down such a current, you come with the current, straight in, with your head right towards the shore,—coming right in, straight, of course, with the current, but the turn to make; and that requires that a tow should be flanked, because we cannot steer around fast enough to make the turn, as a general thing. We do, on some occasions, steer; but it is much safer to flank. Q. State whether or not the Shiras did flank. A. She commenced to flank, in the first place, but, instead of continuing on to back, they came ahead on the boats. Q. Could you tell what bell they were under when they struck the bank? A. No, sir; was not in hearing distance of the bells. Q. And why did you give those whistles that you spoke of? A. Because I thought that it was a mistake. We talked of it in the pilot house,—Captain McDonald, and the captain on the boat,—and seen that it could not be anything else but a mistake, and that they thought they were backing."

The statements of these witnesses are more or less corroborated by certain of the deck hands of the Shiras; but, as their evidence was given under objection, it will be disregarded. A much stronger (and, as it seems, conclusive) corroboration is to be found in the un-

contradicted and, in fact, admitted statements of the captain of the Shiras, made immediately after the accident. This is testified to by Mr. Theis, who is a member of the firm of C. Jutte & Co. He says:

"Q. Did you have any telephonic communication with Captain Morris after this contract or agreement was made? A. I did. Q. On what day? A. On the 7th of February, 1890. Q. And where were you? A. In C. Jutte & Co.'s office. Q. And where was Captain Morris? A. Mr. Morris told me he was at Economy when I talked to him. Q. Did you talk to him through the telephone? A. Yes, sir. Q. Did you recognize Mr. Morris? A. Yes, sir. Q. What was said? A. The conversation was: He asked if Bill or August were in the office, and I told they were, and he asked me to tell one of them to go down as soon as possible; that he had struck his tow. I inquired from him how it came about, and he said the engineer had made a mistake in the bells, and went ahead, instead of back."

A similar account of the cause of the accident was given by Capt. Morris to James Slade, the pilot of the steamboat Dave Woods, which was immediately sent down to the scene of the accident, to render such assistance as she could. Mr. Slade testified as follows:

"Q. Did you ever talk with Captain Morris about the accident while you were there? A. Why, down on the barge, after we landed alongside the stuff, I asked Mr. Morris how it happened; and he made the statement that, if the boat had been backing, it would not have happened."

And again, when Mr. C. Jutte inquired of Capt. Morris the cause of the accident, Capt. Morris gave the same reason. Mr. Jutte testified as follows:

"Q. Did you have any conversation with Mr. Morris? A. Yes, sir. Q. Just tell us where it was, and when. A. It was after I got down to the boat on the Dave Wood. Mr. Morris told me that he noticed the boat going through the water, ahead, and he went downstairs, and asked the engineer why he didn't give him steam sooner. The engineer told him he had given him steam as soon as the bell rang, and he went forward, and noticed the boat going ahead, and he went back, and looked at the wheel, and he was satisfied that the boat was a-going ahead, and he ran downstairs, and went to the engineer."

And finally, to Mr. W. C. Jutte, Capt. Morris reiterates the same explanation. Mr. Jutte testified as follows:

"Q. Did you have any conversation with Captain Morris? A. Yes, sir. Q. When? A. The evening, right there, on the boat. Q. Tell us, in detail, what it was. A. I asked Mr. Morris how they come to sink the boats, and Mr. Morris said that it occurred through a mistake of the engineer,—going ahead, instead of backing the boat; that when the backing bell rang the boat went ahead. He said there was nobody more careful than he was. He said he felt the loss as much as we did. He said the boat could not have been in a nicer shape for going through Deadman's; if they had let her alone, she would have floated through herself; but he thought he would flank her a little more, and they rang backing bell, and the boat didn't answer as she ought to, and he went back downstairs to see why it was not answered more promptly. And he said he went back into the engine room, and saw the machinery working, but did not notice which way it was working, and he said he asked the engineer why he did not answer sooner. He did not notice which way it was answered until he went upstairs. He went upstairs, and looked around, and the boat was closer to the shore than it was when he went down to the engine room,—to the right-hand shore,—and it occurred to him then that the boat was going ahead, instead of backing; that he run back to the engine room, and just about that time she was hitting the bank. Q. Did

you have any other conversation? A. I don't know. We had other conversa-
tions with him. He asked me if we would give him enough tow to go down.
Q. Did you have conversations with the engineer about the accident? A. Yes,
sir; I had a conversation with him the same evening, and I got him to repeat
the same thing the next day. Q. What was it? A. I asked Mr. Lozier how
they come to make the mistake to cause them to sink the boats at Deadman's,
and here is what Mr. Lozier told me; I took it down in pencil. Q. Look over
it, and tell us what he did tell you, taking that as a memorandum. A. I saw
Mr. Lozier, and asked him how he came to make the mistake that caused
him to sink the boat; and Mr. Lozier said the engines were reversed for back-
ing, and he said the going-ahead bell rang, and he said he reversed the engines,
and set them in motion for going ahead. And he said the engines had been
going ahead for about a minute, when Mr. Morris went into the engine room,
and asked him what he was doing, and he said the boat was going ahead until
she hit the bank. Q. Did you make a memorandum of this conversation? A.
Yes, sir. Q. When? A. On the 8th,—the day of the accident. I asked him the
same day of the accident the same thing, when we were there, and I asked
him the next day, to get him to repeat it again. Then I made a memorandum
of it again, and repeated it, right in his presence. Q. Did you refresh your rec-
ollection of this conversation from this memorandum you made at this time?
A. Yes, sir. Q. Did you see the pilot, George W. Moore, there? A. Yes, sir;
I saw Mr. Moore the evening of the accident, and asked him the same thing;
and Mr. Moore told me that, if the engineer hadn't made a mistake, they would
not have sunk the coal."

That these statements were made by the men upon the Shiras is
not contradicted. Capt. Morris alone seeks to explain his admis-
sion by asserting it was simply based upon his opinion, and he had
become satisfied at the time he testified that he had made a mis-
take. No explanation is offered at all by the others. In their testi-
mony, it is true, they now deny that the Shiras was going ahead, and
insist that she was backing as strongly as she could continuously from
the time she should have commenced to flank. But clearly they are
mistaken, for Capt. Morris, noticing that the engine was not backing
when the tow was in a critical position ran down from the pilot house
to the engine room (to quote his own words) "to see what was the
matter. I wanted to know why he was not backing. There we
was, in a very critical position." So it was evident that for some
space of time, when the situation was very critical, the engine was
not backing, notwithstanding the confident assertions of the pilot and
engineer to the contrary. It is very significant that the revised ex-
planations of the accident are given fully two years after it occurred.
The damaging admissions were made on the very day it happened,
when all the incidents were fresh, and the causes which operated to
produce it would have been perfectly well known and understood.
It is impossible to resist the conclusion that this accident must be
laid to the mistake or negligence of the Shiras. The attempt to
show a vis major has failed to convince, while the preponderance of
testimony is that the Shiras was not backing as she should have
been at the critical point of her flanking maneuver, but that her
engines were going ahead.

In reviewing the testimony in this cause, the fact has not been
overlooked that shortly before the Shiras arrived at Deadman's
island the steamboat Hornet, which preceded her about an hour, in
flanking this part of the river, had the misfortune to lose a part of
her tow by having it cast upon the shore by the force of the storm

then prevailing. This fact was strongly pressed upon this court at the argument, as it seems to have been upon the court below. But it has failed to impress. It is quite certain that the Hornet was in her difficulty fully an hour, if not a. longer period, previous to the arrival of the Shiras. The wind storm which affected her came from Sewickley side of the river. Sewickley is on the right bank of the Ohio. The wind which is claimed to have cast the Shiras on the bar came up and from and through Stoop's hollow. Stoop's hollow is upon the left side of the river. If the cause of the accident to the Hornet is to be relied upon in the attempt to establish a vis major in the case of the Shiras, it must be the same cause, operating at the same time, in the same way, and with the same effect; otherwise, it is wholly unimportant and irrelevant. There is no evidence whatever that the gale which wrecked the Hornet continued for an hour thereafter, or that its power for injury remained constant. On the contrary, such evidence as bore upon this matter tended to prove that after 1 o'clock, when the Hornet was wrecked, the storm lessened. There can be, therefore, no analogy between the cases, and no logical deduction as to the similarity of the cause which produced the accident in the respective cases. The result reached is that the decree below must be reversed, and the cause remitted to the lower court to be proceeded with in accordance with this opinion.