## TWEEDIE TRADING CO. v. BARRY et al.

### (Circuit Court of Appeals, Second Circuit.  May 12, 1913.)

### No. 187.

**1. SHIPPING (§ 184*)—ACTION FOR DEMURRAGE—BURDEN OF PROOF.**

In the absence of any provision on the subject in the bill of lading, a consignee is under the duty of receiving the cargo as discharged within a reasonable time, but to entitle the owner to demurrage he has the burden of proving that there was unreasonable delay.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 596; Dec. Dig. § 184.*]

**2. SHIPPING (§ 181*)—DEMURRAGE—WHEN LAY DAYS BEGIN TO RUN.**

Where a contract of carriage requires a vessel to discharge her cargo at a specified wharf, lay days for discharging do not commence to run until she obtains a berth at such wharf unless wrongfully prevented by the shipper.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*]

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Tweedie Trading Company against Charles D. Barry and others, doing business as Henry W. Peabody & Co.  Decree for libelant, and respondents appeal.  Reversed.

For opinion below, see 194 Fed. 286.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham, of New York City, of counsel), for appellants.

R. J. M. Bullowa, of New York City, for appellee.

Before COXE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge.  This is a libel by the charterer of the steamer Sangstad to recover demurrage from the defendants, shippers of lumber, for delay in receiving the same at Rosario.  The freight contract provided:

"Ninth. Tweedie Trading Company's form of B/L to be used for this shipment.  Said B/L to bear the following indorsement: 'It is agreed that in consideration of the Tweedie Trading Co.'s customary form of B/L being used, that the shippers are not responsible for any clauses contained in said B/L which are not contained in the regular River Plate Syndicate form of B/L—Shippers binding themselves only to the aforesaid syndicate form of B/L."

There was a combination of four lines known as the River Plate Syndicate, but there never was a syndicate bill of lading, each line using its own form.

The libelant relies on the ninth article of the Tweedie Company's bill of lading, because, as the libel alleges, it is found in the bill of lading of the Lamport & Holt Line, which was one of the syndicate.  This article reads as follows:

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

205 F.—46

."9. Also, that the ship may commence discharging immediately upon arrival and discharge continuously, any custom of the port to the contrary notwith-, standing, the collector of the port being hereby authorized to grant a general order for discharge immediately upon arrival, the goods to be taken from the ship's tackle, where the carrier's responsibility shall cease by the consignee without notice immediately the vessel is ready to discharge package by package as they come to hand in discharging the ship, and if the goods be not so taken from the ship all responsibility of ship or carrier therefor, either as carrier, bailee, or otherwise, shall be thereupon ended and the agent or master of the ship shall have liberty, for account of, and as the servants of, shipper, owner, and consignee, all and any of them, and at their sole risk, charge, and expense, to hire lighters, and craft for the landing of the goods, to enter and land the same, to put them in hulk, craft, or store, or deposit them in or upon wharf, warehouse, public stores, or custom house or permit them to lie where landed, according to the best judgment of said agent or master, which shall be final and conclusive upon all persons interested without previous notice to shipper, owner, or consignee, and thereupon the goods shall be deemed to be fully delivered, the carrier retaining a lien thereon until payment for all costs, charges, and expenses incurred and also as hereinbefore provided, and the goods to be subject to storage, wharfage, and other charges. If the steamer discharge at wharf consignees to receive cargo there, as above provided, and any detention on the part of the consignees or owners of the cargo in receiving cargo as fast as steamer can deliver in lighter, if the steamer discharges in lighters or in receiving cargo at wharf, if steamer discharges at a wharf, steamer working all, hatches at once, in both instances, to be accounted for by the payment of demurrage by them at the rate of eight pence British sterling per steamer's net registered ton, and steamer to have a lien of cargo for same; unless contrary written agreement outside of this bill of lading."

The first sentence is a familiar one in regular line bills of lading. If it had stopped at the first ten lines, it would have created an engagement to receive the cargo the moment it went over the ship's side. A somewhat similar clause was considered by this court in Tweedie Trading Co. v. Strong, 195 Fed. 929, 115 C. C. A. 617. Reading, however, the whole sentence, it is plainly intended not as a foundation for demurrage claims, but to prevent the possibility of delay, which steamers sailing on schedule could not endure. The second and last sentence was evidently added for the purpose of covering claims for delay, but as it is not contained in the bill of lading of the Lamport & Holt Line or of any line of the syndicate, in accordance with the way both parties have treated the ninth article of the freight contract, it is to be disregarded. Therefore the ship's remedy under so much of the ninth article of the Tweedie bill of lading as is left was to discharge the lumber as fast as possible, and if it was not received by the consignee as it came out, to leave it on the wharf or store it, as the master might elect.

[1] The consignees, however, were, independently of the bill of lading, under the duty of receiving the cargo within a reasonable time and treating the shippers as the district judge did, as the consignees, the bill of lading being to order, the burden lay upon the libelant to prove that there was unreasonable delay in receiving the cargo.

[2] The claim has been developed in extraordinary installments. It was first presented in September, 1905, at Rosario to the Central Argentine Railroad Company for 1½ days delay to the steamer in getting a berth at the wharf named. The same claim was subsequently presented in February, 1906, to the shippers in New York and again in

February, 1909. Then in December, 1909, this libel was filed, making the same claim, only increasing it to 3 days. It was then in December, 1909, changed by amendment from a claim for delay in getting into the berth to a claim for 7 days delay in receiving cargo. For the claim made down to this amendment there was no foundation whatever, because the steamer having agreed to deliver at the wharf named, no demurrage could accrue until she arrived there unless she was wrongfully prevented from getting her berth, of which there was no evidence. See our decision in S. S. Rutherglen v. Howard Houlder (C. C. A.) 203 Fed. 848.

The trial took place in January, 1912, when the libelant offered in evidence a deposition taken at Rosario, in which the witness left the most important questions concerning the discharge and removal of the cargo unanswered, as, for example:

"10. (a) State whether or not the consignees of the cargo took the cargo from steamer's tackle as fast as the steamer was able to discharge the same. (b) If you state they did not, state whether or not they delayed the discharge of the steamer. (c) If you state they did, state how long they delayed the discharge of the steamer.

"No answer.

"11. (a) State how fast the S. S. Sangstad could have discharged her cargo with her own crew had the consignees been ready to receive the cargo as fast as the steamer's crew could deliver it. (b) How long would it have required the steamer's crew to have delivered 636,000 feet of spruce lumber if the consignees had been ready to receive the cargo on the wharf? (c) If you state that the Sangstad was not discharged as fast as she could have been discharged, state what delayed the S. S. Sangstad at Rosario? (d) If you state the Sangstad was not discharged as fast as she could have been discharged, state how long the S. S. Sangstad was delayed because of the consignees not being ready to receive the cargo, stating the number of days.

"(a) I know not.
"(b) I know not.
"(c) I know not.
"(d) I know not.

"12. (a) Are you familiar with the discharge of lumber at the Central Argentine Railroad Company's wharf at Rosario? (b) If you state that you are, state whether you have seen other steamers unloading lumber at the Central Argentine Railroad Company's wharf at Rosario? (c) State what is the usual and customary rate for a steamer similar to the Sangstad to discharge lumber at the Central Argentine Railroad Company's wharf?

"(a) No answer.
"(b) No answer.
"(c) It depends entirely upon circumstances."

The District Judge concluded that there was an unreasonable delay of 7 days in receiving the cargo because 10 days were used, whereas only 3 days were used in loading. But there was no proof at all of the circumstances attending the discharge. The libelant's witness examined in Rosario left the questions on this point entirely unanswered. In the absence of proof on this subject, the libel should have been dismissed.

The decree is reversed, and the court below directed to dismiss the libel, with costs.