**ST. IOANNIS SHIPPING CORPORA-TION, a corporation, Libelant,**

**v.**

**ZIDELL EXPLORATIONS, INC., a corporation, Respondent.**

**Civ. No. 61–537.**

United States District Court
D. Oregon.

Aug. 23, 1963.

Motion for Reconsideration Denied
Oct. 1, 1963.

Lofton L. Tatum, of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for libelant.

Robert F. Maguire, of Maguire, Shields, Morrison, Bailey & Kester, Portland, Or., for respondent.

KILKENNY, District Judge.

Libelant prosecutes this libel in personam against respondent for demurrage and other expenses in connection with a shipment of scrap metal from the West Coast to Japan. Libelant was the owner of the cargo vessel in question. Respondent is a corporation operating a scrap metal yard in Portland, Oregon.

The parties, on May 12, 1961, executed a contract, the legal significance of which is in dispute. The parties agree, however, that the scrap metal was carried under this contract.[1]

1. " * * * We confirm fixture of parcel of scrap on the above vessel, loading at Tacoma, Washington and Portland, Oregon to Tokyo and Osaka, Japan, on the following terms and conditions.

\* \* \* \* \*

Laydays May 25/15 June, 1961.

Loading at Portland and Tacoma to Tokyo and Osaka; rotation at Owner's option. One safe berth at each port of loading and discharging.

Rate of freight $9.00 per long ton FIO and stowed, basis two ports loading and two ports discharging.

Loading 1000 tons per day, Sundays and holidays excepted. Discharging 150 tons per hatch per day, Sundays and holidays excepted.

Demurrage $600/Despatch $300 per day or laytime saved.

Freight to be prepaid in Seattle or Portland in exchange for bills of lading.

Time to commence at each port at 8:00 a. m. the first working day after notice of readiness is given.

Vessel equipped with 5 ton cargo gear, which to be in working order at all times at hatches worked and vessel to furnish lights night and day.

Owners to advise shippers five days prior to loading of rotation and give ten days notice of ETA and expected quantity required, at which time Charterers to declare quantity to be loaded at respective ports.

Owners agents both ends.

\* \* \* \* \*

Stevedoring overtime to be for account of party ordering same, however, officers' and crew overtime always to be for owner's account.

\* \* \* \* \*

Kindly acknowledge your agreement and understanding of the above fixture by signing the two attached copies of this letter." (Signed by libelant and acknowledged and agreed to by respondent with modifications of no relevance or materiality on the issues before the Court).

The vessel was a Liberty-type with a capacity of 10,900 pounds. Libelant first booked a partial cargo of 5,000 metric tons of dry powdered milk in bags to be loaded at Vancouver, Portland and Seattle in that order. The remainder of the cargo space in the vessel was contracted to respondent by the mentioned agreement.

The voyage commenced at Vancouver, Washington on May 29, 1961, when a portion of the milk cargo was loaded. From there the vessel proceeded to the libelant's dock in Portland to load part of the scrap. Thereafter, additional milk cargo was loaded at Portland and the vessel then proceeded to the libelant's dock at Tacoma for the balance of the scrap. The vessel sailed from Seattle to Japan on June 18, 1961, after loading the balance of the milk at that port.

Yokohama was the first port of call, at which port the vessel arrived on July 9th, immediately went into berth and completed a discharge of milk on July 14th, from which port it moved to Kobe on the same day and completed the discharge of the milk cargo in Kobe on July 21st. The vessel arrived at Osaka, a short distance from Kobe, on the same day, but was compelled to wait until August 10th before discharging the scrap cargo. The Osaka scrap was completely discharged on August 29th. The vessel arrived in Tokyo on September 1st. The discharge of scrap at that port did not commence until September 15th and was completed on September 23rd.

A chronology of the events, of particular significance, is set forth in the margin.[2]

The principal questions raised by the Pre-Trial Order are:

### I.

(a) Is deviation, as understood in admiralty law, a defense in a suit for demurrage?

(b) Were the delays in unloading the scrap occasioned by a deviation, or a breach of the contract, by the vessel?

### II.

Under the contract in question, must the vessel be in berth or unloading place, as distinguished from being in port, before lay days and the law of demurrage are applicable?

### III.

Did libelant give respondent, or its consignees, the notices of readiness as required by the contract?

2.

1961

| Date | Time | Place | Event |
|---|---|---|---|
| 5/29 | | Vancouver, Washington | —Began loading milk |
| 5/31 | | Vancouver, Washington | —Completed loading milk |
| 6/1 | 0800 | Portland | —Tendered to Zidell |
| 6/4 | 1800 | Portland | —Completed Zidell loading |
| 6/4 | | Portland Terminal #2 | —Began loading milk |
| 6/7 | | Portland Terminal #2 | —Completed milk loading |
| 6/9 | 1650 | Tacoma | —Tendered to Zidell |
| 6/13 | 1500 | Tacoma | —Completed Zidell loading |
| 6/13 | | Seattle | —Began loading milk |
| 6/17 | 2330 | Seattle | —Completed milk |
| 6/18 | 0120 | Sail for Japan | |
| 7/8 | 2200 | Arrive Yokohama | |
| 7/9 | 1100 | Yokohama | —Began unloading milk |
| 7/12 | 1610 | Yokohama | —Completed discharge milk |
| 7/14 | 1000 | Arrive Kobe | |
| 7/16 | 0800 | Kobe | —Began unloading milk |
| 7/21 | 1330 | Kobe | —Completed discharge milk |
| 7/21 | 2000 | Arrive Osaka | |
| 8/10 | 1300 | Osaka | —Began unloading scrap |
| 8/29 | 2130 | Osaka | —Completed discharge scrap |
| 9/1 | 0350 | Arrive Tokyo | |
| 9/15 | 0950 | Tokyo | —Began unloading scrap |
| 9/24 | 0200 | Tokyo | —Completed discharge scrap |

## DEVIATION

Respondent urges that libelant breached its contract by proceeding first to Yokohama rather than Osaka and then to Kobe rather than Tokyo, all in claimed violation of the express language of the contract.

"2.

\* \* \* \* \* \*

"Loading at Portland and Tacoma to Tokyo and Osaka; rotation at owner's option."

"Owner to advise shipper five days prior to loading of rotation \* \* "

Respondent envisions a perfect result without inconvenience, damage or delay to anyone if the libelant had notified respondent of its intent to proceed to Yokohama first, in which case, it is debated, the Tokyo cargo could and would have been loaded on top of the Osaka cargo and discharged at Yokohama, since Tokyo and Yokohama are essentially the one port.

 Likewise, respondent argues that our present problems would never have been presented, if libelant had notified respondent of its intent to proceed to Kobe before Osaka in that the Osaka cargo could have been discharged at Kobe, Kobe and Osaka being essentially the one port. Historically, the doctrine of deviation has been applied only to cases where there has been damage to, or a loss of, the goods and in such cases the extent of the deviation is of little, if any, significance. The Law of Admiralty, Gilmore and Black, 156. It has been said that "deviation" as recognized in Admiralty Law, substitutes an insurer's liability for the narrower liability as stipulated in the contract. The Willdomino v. Citro Chemical Co., 272 U. S. 718, 725, 47 S.Ct. 261, 71 L.Ed. 491 (3 Cir. 1927); Niles-Bement-Pond Co. v. Dampkiesaktieselskabet Balto, 282 F. 235 (2 Cir., 1922). The Carriage of Goods by Sea Act has certainly modified, and probably eliminated, this dogmatic feature of deviation law and, substituted therefor a liability for the damage actually caused by the deviation. The Law of Admiralty, Gilmore and Black, p. 156. Be that as it may, no authority has been found, by proctors or by the Court, which permits the use of the doctrine of deviation as a defense in a suit in admiralty for demurrage. In my opinion, the doctrine does not apply, and, I so hold. The doctrine has been applied only in cases where the goods were damaged. What remains of the doctrine should be applied in those cases only.

 My decision on the issue of deviation does not, in itself, dispose of the first point. The issue encompasses an alleged breach of contract which is a field much broader than the rather limited field of the law of deviation. The route, insofar as one is specified in the contract, shows loadings at Portland and Tacoma, thence to Tokyo and Osaka, for discharge, with rotation at the owner's option. It must be remembered that this contract was between libelant and respondent only. Libelant had full and complete knowledge of the fact that other cargo was to be carried on the vessel and must be charged with knowledge that the other cargo might be unloaded at ports other than those mentioned in the agreement. Milk was the first cargo loaded in Vancouver. Libelant's scrap was then loaded in Portland, more milk was loaded in the same city, scrap was then loaded in Tacoma and the cargo was finished by loading milk in Seattle. There is nothing in the agreement as to when, where or under what circumstances the milk would be discharged. Any reasonable approach to a solution drives me to the conclusion that the milk being on top, the parties knew that the milk would first be unloaded. All agreements must be read and construed in the light of the existing situation and the knowledge of the parties at the time of the loading and the practical interpretation as placed on the provisions of the contract by the parties. In view of the method of loading of the particular cargo, common sense prevents an interpretation of the contract which

would require the libelant to discharge and reload the milk in order to permit respondent to remove its cargo at a port other than designated in the contract. Business contracts must be construed as businessmen would interpret them. A businessman's approach would be a practical one. He would recognize he was dealing with a vessel carrying two types of cargo for two distinct shippers with four separate and distinct ports for discharge of cargo. The practical interpretation placed on the transaction, by the parties, as businessmen is of importance. Respondent had full knowledge of the milk cargo and knew it was stored on top of the scrap metal. Under ordinary circumstances it might seem strange for a vessel to discharge cargo at Yokohama, thence go south to Kobe for discharge there and at Osaka, and then return north for final discharge at the Port of Tokyo, a short distance from the original discharge at Yokohama. I cannot say here, however, that the libelant, in the exercise of reasonable prudence, could not have arrived at the conclusion that it would be sound maritime practice to first unload the milk at the inside ports of Yokohama and Osaka and then unload the scrap at Kobe, the most southerly port, and Tokyo, the most northerly port. There is no creditable evidence in the record that such action on the part of libelant in any way inconvenienced the respondent or in any way caused or tended to cause a delay in unloading the scrap cargo. Considering the stowage of the cargo and the ports of discharge, the route taken by the libelant does not seem unreasonable, and certainly it does not breach the agreement between these particular parties.

Cases such as Sheldon & Co. v. Hamburg Amerikanische Packetfahrt-Actien-Gesellschaft, 23 F.2d 249 (3 Cir., 1928); W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha, 7 F.2d 889 (N.D.D.C.Cal. 1925), are principally concerned with the law of deviation, and even that if law was applicable to the facts in this case, the decisions in those cases would not in any way change or alter my finding on the subject.

If respondent, well knowing that the milk cargo was stored on top of the scrap metal, felt that it should have preference in the discharge of its scrap cargo, it should have incorporated such a requirement in the agreement. I find that respondent has failed to produce any substantial evidence that it could have discharged the Tokyo cargo at Yokohama, or the Osaka cargo at Kobe, with less delay than was later encountered at the other ports. I had the opportunity to see and observe the live witnesses. The testimony of Rosenfeld to the contrary notwithstanding, I do not believe it was feasible to unload the Tokyo scrap at the milk berth in Yokohama. Nor is there any substantial evidence that the Osaka scrap could have been unloaded at the Kobe milk berth. To the contrary, it would seem that such a procedure would be highly unusual.

■■ Proctors for respondent make an able, and under a different state of facts what would be a convincing, argument that the failure of the vessel to follow the geographical order of ports caused delay and that there is nothing in the record to indicate that the vessel could not have been speedily given a berth if it had gone to Osaka in the first instance and then to Tokyo. The record shows that those ports were just as crowded when the vessel discharged the milk cargo as on the date of arrival for discharge of scrap. Respondent would be on much sounder ground and the argument would be ever more logical if respondent had no notice or knowledge of the fact that the vessel was to first call at Yokohama and then discharge milk at Kobe. The possession of such knowledge in respondent I find as a fact. The argument that there is nothing in the record to show that lighters and barges were not immediately available at Yokohama and Kobe is beside the point and unsupported by the evidence. The weight of the evidence is that respondent knew

of the destination of the milk cargo from the beginning of the loading and made no objection. In conclusion, I find:

(1) That the principle of deviation is beside the mark and irrelevant to the factual problem here presented, and,

(2) Even if applicable, the facts in the case do not show an unreasonable deviation which would amount to a defense, and,

(3) That the discharge of the milk cargo at the ports, in the manner discharged did not constitute a breach of the contract such as would relieve respondent from its legal duty to discharge the contract within the agreed lay time. The legal and factual issues on this question are resolved against respondent.

## IN PORT OR IN BERTH

Here, there is put to me for decision, under the contract and evidence, the question of whether the demurrage commenced after arrival in port and notice of readiness or was it a condition that libelant should place the vessel in berth before demurrage would commence to run.

The Port Authorities in Osaka and Tokyo have complete jurisdiction over the assignment of berths to ships arriving in the respective ports and cargo cannot be discharged without permission of those authorities. The vessel arrived in Osaka on July 21, 1961, at 2000 hours but was not assigned a berth by the Port Authorities until August 10, 1901, at 0840 hours. The vessel reached Tokyo on September 1, 1961, at 0400 hours, but was not assigned a berth by the Port Authorities until September 15, 1961, at 0830 hours. On the record, I find that neither libelant nor respondent was aware of any congestion in the said ports at the time the contract was made, nor at the time of loading the cargo in Portland, Tacoma and Seattle. Rosenfeld himself, an officer of respondent, was familiar with the manner in which shipments of scrap were handled in the various ports of Japan and in particular the Ports of Tokyo and Osaka. Discharge cannot be made at any place in the harbor except at the buoy which is designated by the Harbor Master. Although the parties were not aware of congestion in the ports at the time the contract was made, they were aware of, and had full knowledge of the fact that the Port Authorities in said ports had complete jurisdiction and that the cargo could not be discharged without permission of those authorities. Having full knowledge of that fact the parties entered into the contract in question.

A proper construction of the contract must be premised on the fact that both parties were familiar with the power of the Port Authorities at Osaka and Tokyo.

Respondent argues that where the discharge berths are under the sole control of a public authority, the ship is not an "arrived ship", and lay days do not commence to run until those authorities have assigned, and permitted the ship to enter a berth. In support of this argument counsel cites Flood, et al. v. Crowell, 92 F. 402 (5 Cir., 1899), and the Edward T. Stotesbury, 187 F. 111 (2 Cir., 1911). Simply stated, these authorities do not support respondent's contention. In the Flood case the agreement had no provision that lay days should commence on the arrival of the ship in port or any other provision from which could be implied a contract to furnish a place for discharge. Stotesbury supports the position of libelant, rather than that of respondent. Anderson v. J. J. Moore & Co., 173 F. 539 (D.C.N.D.Cal.1909) presents an outstanding example of a berth "as ordered" agreement and merely holds that where the agreement expressly provides that the charterer shall have the right to designate the pier, such an agreement presents exactly the same situation as if the pier was expressly named in the agreement. No such language is used in the instant contract. Tweedie Trading Co. v. Barry, 205 F. 721 (2 Cir., 1913) must be placed in the same category.

Closely related to this point is respondent's argument that the delay in obtaining a discharge berth was a "vis major or its equivalent", which would relieve it from liability. Neither Crossman v. Burrill, 179 U.S. 100, 21 S.Ct. 38, 45 L.

Ed. 106 (1900), nor United States v. Atlantic Refining Co., 112 F.Supp. 76 (D.C. N.J.1951), supports respondent's claim. Supporting libelant's position that delays due to the congested condition of the port do not fall within the legal definition of a "vis major" is the P. Dougherty Co. v. 2471 Tons of Coal Ex Barge Annapolis, 278 F. 799 (D.C.Mass.1922), another case cited by respondent. A loss "vis major" (superior force) is a loss that results immediately from natural cause, without the intervention of man, and could not have been prevented by the exercise of prudence, diligence and care. Jutte v. The George Shiras, 61 F. 300 (3 Cir., 1894); The Adventuress, 214 F. 834 (D.C.Mass.1914); Southern Pacific Co. v. Schuyler, 135 F. 1015 (9 Cir., 1905).

Although the proctors have devoted substantial segments of their Briefs to the question of whether the contract should be designated as a fixture note, a contract of affreightment or a charter party and each has presented a penetrating analysis of the agreement, I have arrived at the conclusion that the name I may assign to the instrument is of no importance. A Bill of Affreightment may be viewed as a charter, but it certainly does not amount to a demise of the vessel. Grimberg v. Columbia Packers' Ass'n, 47 Or. 257, 83 P. 194. I see no distinction between a Bill of Affreightment and a Fixture Note.

Poor, in his discussion of demurrage, Charter Parties and Ocean Bills of Lading, p. 30, divides a contract of carriage into two parts: (1) where the time for loading or discharging is definitely fixed, and (2) where there is no such provision or one for a "quick" or "customary" discharge. I find that this agreement falls within the first classification. Here the contract involved the shipment of a given tonnage at a specified rate: "Rate of Freight $9.00 per long ton FIO and stowed * * *". The International Maritime Dictionary, p. 281 defines "FIO" (Free in and out) as a term by which the owner who charters the ship is responsible for all the costs of ship management with the exception of loading

and discharging cargo * * *". The same definition would place the responsibility for loading and discharging the cargo on the shipper, such as libelant. The rate of discharge was clearly fixed by the instrument:

"Discharging 150 tons per hatch per day, Sundays and holidays excepted".
This language and provision as to time, without question, places our contract in the first of Poor's categories. The Law of Admiralty, Gilmore and Black, p. 187. As a general rule, where the *time* for discharge is fixed, such as here, the shipper takes the risk of unforeseen circumstances, such as, crowded docks and port congestion. United States v. Atlantic Refining Co., 112 F.Supp. 76 (D.C.N.J. 1951); Empire Transportation Co. v. Philadelphia & R. Coal & Iron Co., 77 F. 919 (8 Cir., 1896).

That the parties recognized the distinction between a "berth" and a "port" is obvious. The contract provided for "one safe *berth*' at each 'port' of loading and discharging".

When the parties made provision when time would commence to run they designated "each port", but did not mention a berth:

"Time to commence at *each port* at 8:00 A.M. the first working day after notice of readiness is given."
This language is clear and unambiguous. No mention is made of time commencing after reaching a "berth".

Since the parties included "port" and excluded "berth" from the language of the paragraph covering the requirements with reference to time, it is quite proper and timely to invoke the rule of construction, *inclusio unius est exclusio alterius*.

The language of the contract being clear and definite, as to when and where the time for discharge should commence, we have little difficulty in finding the applicable law. Thus, Carver in his work Carriage of Goods by Sea, 10th Ed., p. 865, states the general rule:

"THUS, a distinction is to be drawn between 'port' and 'berth' charters. In the case of a port char-

ter (that is to say, a charter which requires the vessel to proceed for loading to a named port but not to some particular berth either specified in the charter party or by the express terms of the charter to be specified by the charterer) the charterer has an implied right to nominate the particular berth to which the vessel is to go, but * * * lay days begin to run so soon as the vessel has arrived in the commercial area of the port, is ready to load and has given notice to the charterer in manner prescribed by the charter of his readiness to load; whereas in the case of a berth charter (that is to say, a charter which requires the vessel to proceed for loading to a particular berth either specified in the charter or by the express terms of the charter to be specified by the charterer) lay days do not begin to run until the vessel has arrived at the particular berth, is ready to load, and has given notice to the charterer in manner prescribed by the charter of her readiness to load." (citing North River Freighters v. President of India, 1956, 1 Q.B. 333, 347, 348).

The leading case on the subject is Leonis S.S. Co. v. Rank (1908) 1 K.B. 499.

Respondent contends that libelant should have inserted what is known as a Wibon clause in the agreement, if it intended that lay days should commence before the ship was "in berth". Such a clause would be in direct conflict with the provisions of the agreement before me. In my opinion, Wibon has application only to those agreements where a berth is mentioned in the charter.

Demurrage, in the final analysis, is nothing more than extended freight and the risk of variability, such as congested harbors which prevent the discharge of cargo within the stipulated lay days, is placed, without condition, on a person in the position of respondent. Empire Transp. Co. v. Philadelphia & R. Coal & Iron Co., 77 F. 919 (8 Cir., 1896); United States v. Atlantic Refining Co., 112 F.Supp. 76, 80 (D.C.N.J.1951).

Although respondent contends that custom and usage in the Ports of Osaka and Tokyo would relieve it from the duty of paying demurrage, the fact remains that there is no testimony to support this contention. One of libelant's witnesses stated that he was in these ports in July, 1961, that the ports were congested and that vessels were expected to await their turn. There is no proof of any custom and usage existing at the time the contract was made. In any event, Zidell agreed to discharge at a specified rate upon presenting at the named port and this agreement would, of itself, eliminate a custom and usage in conflict therewith.

Proctor for respondent argues that libelant was a general ship, citing Alexander Eccles & Co. v. Strachan Shipping Co., 21 F.2d 653 (D.C.S.D.Ga.E.D.1924). Libelant does not fall within the definition of a "general" ship as used in that authority. If libelant was a "general" ship, it would be a common carrier and, as such, would be under an obligation to place itself "in berth" before time would commence to run. Conceding, arguendo, the correctness of libelant's contention, the fact remains that the Ioannis K was a "tramp", rather than a "general" ship on this voyage and the obligations of a common carrier have no applicability. Home Ins. Co. v. Riddell, 252 F.2d 1 (5 Cir., 1958).

### NOTICE OF READINESS

The contract makes the giving of notice of readiness a condition to the commencement of the running of time.[3] Libelant concedes this requirement, but claims:

(1) That notice was actually tendered to the consignees named in the bills of lading, and,

(2) That respondent had no representative in Japan on whom to

3. " * * * Time to commence at each port at 8 a. m. the first working day after notice of readiness is given. * * * "

serve the notice and is, therefore, relieved of its obligation under the authority of Hatton v. DeBelaunzaran, 26 F. 780 (D.C.S.D.N.Y.1885), and,

(3) That respondent and the consignees knew when the vessel arrived at each of the discharging ports.

I have carefully and thoroughly examined the record, and, in particular have read and re-read the testimony of the Master of the vessel, which libelant says establishes its contention that it tried to give notice to the consignees as required by the bills of lading, but consignees refused to accept the notice as tendered. The notices were still in the possession of libelant at the time of the trial and ruling was reserved on such offers. I now reject such offers, in that, I find nothing in the record to support libelant's claim that such notices were ever tendered to the consignees or to anyone else connected with the libelant. In the final analysis this witness's testimony amounts to nothing more than a plan in his own mind to give the notices. Notice of readiness was never served or tendered to any representative of respondent, consignees or otherwise. This claim of libelant is unsupported by evidence and is fatal to libelant's claims for demurrage in Japan.

It is true that the respondent had no agent or authorized representative in Japan, other than the consignees named in the bill of sale. This finding, however, is of little help to libelant. The facts in the case cited by libelant are readily distinguishable from the facts before me. In Hatton v. DeBelaunzaran, 26 F. 780 (D.C.S.D.N.Y.1885), oral notice was actually given to the charterer's agent at the port of discharge. The agent claimed he knew nothing about being named as such. Although the opinion states that the charterers were guilty of negligence in not having an agent to whom notice could be given, I think it would be more accurate to say that under the facts in that case there was a waiver of the provision for written notice. Libelant in that case attempted to serve the written notice, but the named agent refused to accept it. The record shows that the agent was not notified of his duty until after the Master *cabled* the charterer. This was in the year 1885. The Master in that case made excellent use of the rather limited electrical transmission equipment then available, while in the instant case the Master of libelant, with excellent equipment, made no attempt to contact the respondent. Without question, a message would have been received by respondent within a few hours after libelant's arrival in either one of ports and the question of proper notice would not be an issue.

It is urged that respondent and its consignees, had actual knowledge of the time when the vessel arrived in each of the discharging ports. There is not one word of testimony in the record to support this contention. Even if the record supported libelant's position, there would be no knowledge in respondent or its consignees, as to when libelant was ready to discharge. True enough, the Log Book shows that discharging commenced immediately after the ship was given a buoy. From this it could be inferred that respondent or its consignees had actual notice of the fact that the vessel was ready to discharge on that particular day. But I cannot infer, from that entry, that respondent or its consignees, had actual notice on the date of arrival of the vessel or had prior notice of the vessel's readiness to discharge.

█ I find that libelant has the burden of proof on this, as well as other issues. On this issue it has failed and, consequently, not entitled to recover demurrage for delay at either Osaka or Tokyo.

FRINGE ISSUES

█ Issues dealing with demurrage and dispatch during the loading operations at Portland and Tacoma and extra stevedoring expense during the discharge in Japan are comparatively minor, in nature, and are entirely unconnected with the main claim for demurrage. I shall now dispose of those claims. There is substantial evidence to support the

claims for demurrage at Tacoma and dispatch at Portland. I find that the claim at each port should be computed separately. Libelant is entitled to recover the sum of $41.25, being the difference between $365.00 demurrage incurred in Tacoma, Washington, and $323.75 dispatch earned in Portland, Oregon. I further find that respondent should pay $1,050.00, the amount which it agreed to pay on the extra stevedoring expense. The cost of moving to a second berth at Osaka in the sum of $100.80 is also allowed to libelant.

To clear the record, the offer of Exhibit No. 13 in evidence is rejected.

I adopt this Opinion as my findings of fact and conclusions of law. Proctor for respondent shall prepare, serve and present an appropriate decree. Proctors may, if they so desire, present proposed additional findings. Costs to neither party.

The Court is of the opinion that there is merit to the libelant's claim that it is entitled to demurrage for delay while the vessel was in actual discharge of its cargo at Osaka. I agree that a formal notice is unnecessary after discharging has been commenced. Washington Marine Co. v. Rainier Mill & Lumber Co., 198 F. 142 (D.C.Or.1912); THE DRIEBERGEN, 60 F.2d 367 (C.C.A.5, 1932).

Under the terms of the contract the respondent agreed to discharge the cargo at the rate of 150 tons per hatch per day. Discharging commenced at Osaka at 1300 hours on August 10, 1961. On the basis of 150 tons per hatch per day in Osaka, I find that laytime amounted to 9 days, 18 hours and 27 minutes. From the time the vessel commenced discharging until completed, respondent was chargeable with 17 days, 8 hours and 30 minutes. This would entitle the vessel to demurrage for 7 days, 14 hours and 3 minutes at $600.00 per day, or a total of $4,553.64.

The figures in the record on the laytime, total time and the dispatch time at Tokyo cannot be reconciled and, outside of the figures mentioned in my previous Opinion, I will award neither demurrage nor dispatch at that port, nor respondent's claimed loss of time and services at Portland.

On reconsideration, I find that, in addition to the sums mentioned in the original Opinion, the libelant is entitled to the sum of $4,553.64 for demurrage at Osaka. Otherwise, the motion for reconsideration is denied.

An appropriate decree shall be prepared and presented.