Argued February 7, modified June 1, 1973

## SAUSE BROS. OCEAN TOWING CO., INC., *Appellant, v.* GUNDERSON, INC., *Respondent.*

510 P2d 541

*J. Laurence Cable,* Portland, argued the cause for appellant. With him on the briefs were Souther, Spaulding, Kinsey, Williamson & Schwabe, and Robert G. Simpson, Ridgway K. Foley, Jr., and Terry C. Hauck, Portland.

*William F. White,* Portland, argued the cause for respondent. With him on the brief were White, Sutherland, Brownstein & Parks, Portland.

Before O'CONNELL, Chief Justice, and MCALLISTER, DENECKE, HOWELL, and BRYSON, Justices.

BRYSON, J.

Plaintiff commenced this action to recover $10,800 from defendant under the demurrage provision of a contract of affreightment. Defendant's answer consisted of a general denial and three affirmative defenses. The case was tried before the court sitting without a jury. After making findings of fact and conclusions of law, the court entered judgment for plaintiff in the sum of $800, based on two days' demurrage at $1,800 per day less $2,800 setoff as hereinafter discussed. Plaintiff appeals and defendant cross appeals.

Plaintiff is a private ocean freight carrier, and defendant is a manufacturing firm with a plant in Portland, Oregon. In July 1969 defendant hired plaintiff to ship 492 tons of hatch covers to Willamette Iron & Steel Co. in Richmond, California, and 665 tons of miscellaneous steel fabrications to National Steel & Shipbuilding Co. in San Diego, California. The con-

tract of affreightment consisted in part of a minimum rate schedule or tariff which was written and submitted by plaintiff to the Interstate Commerce Commission. The schedule provided:

> "Demurrage on carriers vessels will be charged on all delay to the vessels at either the origin point or the destination point in excess of time allowed on individual rate pages of this schedule, at the rate of $1800.00 per day or fraction thereof. No demurrage will be charged when the delay in loading or discharging is occasioned by causes of force majeure.
>
> "* * * * *
>
> "* * * Carrier shall notify shipper 12 hours in advance of *estimated* time of arrival at loading and discharge points. Shipper shall be allowed 24 hours to load cargo and 24 hours to discharge cargo. Time in excess of allowed loading and/or discharge time shall be charged demurrage as provided for in Item 20. * * *" (Emphasis in original.)

During the negotiations of this contract, defendant explained to plaintiff that it was desirable to schedule the cargo to arrive in San Diego prior to Saturday, September 6, because National Steel, consignee, was launching a ship on that date. The launching of the vessel rendered any cargo unloading operations impossible. Plaintiff assured defendant that it would do what it could to deliver the cargo to San Diego before the scheduled launch.

Plaintiff's tug Kokua and barge Kilchis arrived at defendant's dock in Portland at 11:30 a.m. on Monday, August 25. The Kokua had run aground while proceeding up the Columbia river and was dispatched to the shipyard at Swan Island in Portland for dry-dock and repairs. Defendant's crew loaded the Kilchis during the daylight hours of Monday, Tues-

day, and Wednesday. On Thursday, August 28, it appeared that defendant's crew would be finished in time for a Thursday night departure, but plaintiff learned that the Kokua would be unable to leave dry dock until Friday night. The parties determined that if plaintiff sent for a substitute tug from Coos Bay, Oregon, and the two vessels departed for Richmond, California, on Thursday night, the cargo would arrive there on Monday, September 1, which was Labor Day, and no unloading crew would be available. The substitute tug would also cost plaintiff an additional $2,800. The parties decided to wait until the Kokua was repaired.

At some point during these discussions, James Robertson, plaintiff's superintendent, informed defendant's sales manager that the cargo was estimated to arrive in San Diego at 8 a.m. on Friday, September 5.

The Kokua arrived at defendant's dock just after midnight on Saturday morning, August 30, and departed with the barge for Richmond, California, at 6 a.m.

At 7:10 p.m. (1910 hours) on Tuesday, September 2, the Kilchis was secured at the unloading slip of Willamette Iron & Steel Co. in Richmond. The cargo discharge was completed by 9:30 a.m. (0930 hours) on Wednesday, September 3. The total time for discharge of cargo at Richmond was 14 hours and 20 minutes.

At midafternoon on Friday, September 5, Jean Goodloe, a representative of plaintiff, informed Don Christensen, National Steel's purchasing agent, that the vessels would arrive in San Diego at approximately 10:30 p.m. that night. Christensen replied that

National Steel was launching a ship on Saturday, that the crew did not work on Sunday, and that National Steel would not be able to unload the cargo until Monday, September 8. Christensen requested that the vessels be sent to an alternative dock, pier 12, and wait there until an unloading berth was available at National Steel. Goodloe relayed this information to Captain Davis of the Kokua via radio.

As he approached San Diego on Friday evening, September 5, Captain Davis determined that the only pier 12 shown on his charts was located in a restricted military area. He contacted the harbor patrol and was assigned pier 10 (Tenth Avenue Terminal), berth 6, as a temporary mooring. The vessels were secured into this temporary dock at 12:35 a.m. on September 6, and Captain Davis immediately informed National Steel of his arrival. A representative of National Steel told Captain Davis later that morning that no unloading dock would be available until early Monday morning. At 4:40 a.m. (0440 hours) on Monday, September 8, the barge Kilchis was berthed at National Steel. The discharge was completed by 6:20 p.m. (1820 hours) on the same day, making a total of 65 hours and 45 minutes for cargo discharge at San Diego.

At the conclusion of the trial, the court found that plaintiff was entitled to two days' demurrage under the contract of affreightment. However, the court reduced the judgment from $3,600 to $800 because plaintiff had not been forced to expend $2,800 to hire a substitute tug to tow the Kilchis while the Kokua was being repaired in Portland.

Plaintiff first assigns as error that "[t]he Circuit Court erred in awarding plaintiff only 2 days of

demurrage," and contends that it is entitled to three days of demurrage on both the loading and unloading operations for a total demurrage of six days, or $10,800.

There are three points of vessel detention where demurrage might occur—cargo loading at Portland and discharge at Richmond and at San Diego. The term "demurrage" is defined as:

"* * * The sum which is fixed by the contract of carriage, or which is allowed, as remuneration to the owner of a ship for the detention of his vessel beyond the number of days allowed by the charter-party for loading and unloading or for sailing. * * *" Black's Law Dictionary 519 (Rev 4th ed 1968).

■ The trial court found that the demurrage provision in the contract of affreightment was drafted by plaintiff and should be strictly construed against plaintiff. We agree. See 13 CJS 806, Carriers § 343. The court stated in its Finding No. 6:

"* * * It provided, as was intended, a demurrage rate of $1,800.00 per day or fraction thereof when 'vessels'—at least two, i.e. tug and barge—were delayed by defendant in excess of time allowed for loading * * *."

■ Plaintiff argues that the contract did not require the Kokua to stand by and assist during the loading process. We do not agree. The tug Kokua was one of two vessels chartered by defendant. From the outset the parties contemplated using two vessels, a tug and a barge, to transport defendant's cargo. The barge Kilchis could not be maneuvered without a tug. These facts, coupled with the use of the term "vessels" in the contract, confirm that the trial court was correct in concluding that the contract required defendant

to pay demurrage only when both vessels were delayed by defendant beyond the agreed 24-hour lay time. Since no act of defendant delayed the Kokua over 24 hours (contract allotted time for loading) at the loading dock, no demurrage was recoverable for the loading operation at Portland.

The written findings of the court do not clearly explain how the court determined that defendant was liable for two days of demurrage. Plaintiff argues in its reply brief that the court allowed one day of demurrage on the Portland loading operation. Although portions of the dialogue between the court and counsel at the conclusion of the trial tend to support this conclusion, the court's written findings indicate that the court allowed no demurrage on the Portland loading operation. Finding No. 6 states in part:

> "* * * There is no evidence from which the Court can find a reasonable demurrage rate for the barge KILCHIS if alone delayed. *Plaintiff and not defendant delayed commencement of the voyage from Portland, Oregon.*" (Emphasis supplied.)

■ A trial judge's antecedent remarks or opinions, not embodied in his written findings and judgment, may not be used to attack or impeach the findings or judgment on appeal. *See Ferree v. Doric Co.,* 62 Wash 2d 561, 566-67, 383 P2d 900, 904 (1963); *Barone v. Barone,* 207 Or 26, 29, 294 P2d 609, 611 (1956).

Plaintiff next contends that the court should have allowed three days of demurrage on the unloading operations (Richmond and San Diego).

The court found that the unloading operation at Richmond, California, consumed 14 hours and 20 minutes, and this finding is supported by the Kokua's

log book, received in evidence. Concerning the unloading operation in San Diego, the court made the following written findings of fact:

"[10.] Before plaintiff's tug and barge departed Portland, Oregon it knew that the barge could not be discharged on Saturday, September 6, 1969 at National Steel & Shipbuilding Co. dock because of a scheduled ship launching. Plaintiff undertook to deliver the KILCHIS at her destination point in San Diego, California prior to September 6, 1969 in time to be discharged prior to the scheduled ship-launching. Plaintiff's delay and inability to present barge KILCHIS at the San Diego destination point earlier than 0450 hours of September 8, 1969 was due to plaintiff's negligence and/or forces majeure including:

"(a) Collision with underwater object of Tug KOKUA in the Columbia River enroute to Portland, Oregon which necessitated her spending five days in a repair yard.

"(b) Caught submerged object in propeller of Tug KOKUA when leaving Portland, Oregon at 0230 hours on August 30, 1969.

"(c) Tug KOKUA entered Coos Bay, Oregon and spent two hours in that port repairing radio, taking on stores and changing crew.

"(d) While at sea radar broke down at 2100 hours on September 1, 1969 with tug and tow encountering dense fog at 2230 hours which fog continued until after 1236 hours on September 2, 1969.

"(e) Tug KOKUA spent morning of September 3, 1969 at Richmond, California waiting for radar to be repaired.

"(f) Radar of Tug KOKUA broken again at 1347 hours of September 5, 1969 while tug and tow were approaching San Diego, California.

"(g) Master of tug KOKUA being confused or uninformed upon entering San Diego port tied up

barge KILCHIS at wrong dock instead of dock of destination point.

"Plaintiff itself brought about any delay occasioned in not presenting barge KILCHIS for loading at the destination dock earlier than 0430 hours on Monday, September 8, 1969."

The findings of fact and conclusions of law, including the above, were submitted by the defendant. Plaintiff filed objections to the findings of fact and conclusions of law which included:

"Plaintiff objects to Finding numbered 10 for the reason that the Court did not make such findings in this case and even if such findings were made they are irrelevant since the minimum rate schedule provides that plaintiff was not required to nor did undertake to deliver the cargo at any particular time prior to September 6, 1969 or any other time."

No hearing or determination was made on the objections. ORS 17.431 (3).

■ We do not set aside or disregard court findings in a law action unless they are unsupported by any substantial evidence. *Gordon Creek Tree Farms v. Layne et al,* 230 Or 204, 217, 358 P2d 1062, 368 P2d 737, 739 (1962). Our review, therefore, is limited to the discovery of any substantial evidence to support the court's findings and to the court's application of the law to the facts. *Brandt v. Premier Insurance Co.,* 260 Or 392, 397, 490 P2d 984, 985 (1971).

The contract of affreightment Minimum Rate Schedule, Item No. 10, 5 (a), stated:

"* * * Carrier shall not be required to make delivery at the port of discharge at any particular time, or meet any particular market, or in time for any particular use."

There was no evidence that plaintiff's representatives specifically promised to deliver the cargo to National Steel before the ship launching. William Tagmyer, defendant's sales manager and the man who negotiated the contract of affreightment on behalf of defendant, testified as follows:

"Q All right. Did Mr. Robertson do anything or tell you anything about what he was going to do in relation to getting this material down as you indicated?

"A Mr. Robertson and I had a conversation, I believe it was the middle of the week, relative to him contacting Mr. Bob Huget at WISCO in Richmond and he after we had that conversation, he informed me he had negotiated an 0800 arrival time, which was the day following Labor Day, and he told me that WISCO would be agreeable to unloading the covers at that time and that [sic] this type of schedule we still have no problem in getting down to National Steel in sufficient time to unload the derricks prior to the launching on that following Saturday.

"Q Did he at this time tell you the estimated time of arrival at San Diego?

"A We talked about the estimated time of arrival of sometime Friday morning in the a.m. hours."

■■ The contract of affreightment and the evidence of plaintiff's representations must be "read and construed in the light of the existing situation and the knowledge of the parties at the time * * * and the practical interpretation as placed on the provisions of the contract by the parties." *St. Ioannis Shipping Corp. v. Zidell Explorations, Inc.*, 222 F Supp 299, 302 (DC 1963). All the evidence adduced at trial indicated that it is nearly impossible to schedule the departure and ar-

·rival of a tug-and-barge cargo transport for a voyage at sea with any real precision. According to the evidence, the estimated time of arrival discussed by the parties was a flexible calculation subject to variation by a number of factors, including time of year, weather, length of voyage, equipment, etc. In short, when James Robertson spoke to Mr. Tagmyer before the vessels departed for California and told him that he foresaw no problem in meeting an estimated time of arrival approximately one week later in San Diego, he in no way implied that the vessels would definitely arrive at that time or that the affreightment contract was so amended.

■ The seven occurrences recited by the court as the causes of the delay in the vessel's arrival in San Diego do not, as a matter of substantive law, excuse defendant from its responsibility for demurrage. The principle is explained in G. Gilmore & C. Black, The Law of Admiralty 188 (1957), quoting *United States v. Atlantic Refining Co.*, 112 F Supp 76, 80 (D NJ 1951):

> " 'It is well recognized that demurrage is extended freight and that the risk of vicissitudes which prevent the loading or discharge of cargo within the stipulated lay days lies unconditionally with the charterers. Yone Suzuki v. Central Argentine Ry., 2 Cir., 27 F.2d 795; The Marpesia, 2 Cir., 292 F. 957. But, this absolute liability to pay demurrage is subject to three exceptions: (1) specific exonerating clauses in the charter party; (2) the delay being attributed to the fault of the shipowner or those for whom he is responsible; and (3) a vis major amounting to "a sudden or unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers." ' "

See also W. Poor, Charter Parties and Ocean Bills of Lading § 46 (4th ed 1954):

> "* * * [U]nless expressly provided otherwise, the exceptions will protect the charterer only in the actual operations of loading and discharging *and not in procuring the cargo or bringing it to the loading port. * * *"* (Emphasis supplied.)

The only specific exonerating clause in the contract of affreightment related to forces majeure. The events designated by the court as examples of "plaintiff's negligence and/or forces majeure" might have caused a delay in transporting the cargo to the unloading dock in San Diego, but none caused a delay in the discharge process itself. Unless the carrier's negligence or forces majeure have caused the unloading process to extend beyond the designated unloading period, the shipper's responsibility for demurrage remains absolute. We express no opinion as to whether the events set forth in the court's Finding No. 10 constituted "force majeure." See 36A CJS 953.

The court's finding that plaintiff caused the delay in delivering the Kilchis to the proper unloading dock in San Diego is contrary to all the evidence in the case.

■■ The Kokua and the barge arrived in San Diego at 12:35 a.m. on Saturday, September 6, and the captain immediately informed National Steel of the arrival. National Steel was unable to provide an unloading dock until 4:40 a.m. on Monday, September 8, 1969. The rule to be applied in this situation is stated in G. Gilmore & C. Black, *op cit, supra* at 187-88:

> "* * * [T]he delay in loading or unloading is often occasioned by circumstances beyond the control of the charterer; inability to get a berth to

> which to order the ship is an illustration. When such a case comes to court, it is necessary to decide whether, given the actual terms of the charter, the charterer is to be excused; * * *. The general rule is that the charterer, having undertaken absolutely to see the ship loaded in a stated time, assumes the risk of all casualties preventing this, and the obligation of paying demurrage if anything goes wrong. * * *"

Plaintiff's vessels were forced to lie idle at a temporary dock in San Diego until National Steel provided an unloading dock on Monday morning. The risk of such a delay, whether caused by the unwillingness or inability of National Steel to obtain a berth for the discharge of the cargo, was a risk which defendant assumed when it agreed to the demurrage clause in the shipping agreement. There was no agreement by plaintiff Sause Bros. to arrive in San Diego in time for the barge to be unloaded before September 6. Therefore, Item No. 10, 5 (a), of the affreightment contract stating, "* * * Carrier shall not be required to make delivery at the port of discharge at any particular time, or meet any particular market, or in time for any particular use," is applicable.

All the evidence shows that defendant received notice of plaintiff's ETA (estimated time of arrival) in San Diego several days in advance of the actual arrival and National Steel was notified immediately upon arrival. Therefore, the unloading period, or lay time, in San Diego commenced upon the arrival of plaintiff's vessels in San Diego at 1235 hours on Saturday, September 6, 1969.

■ We compute the total cargo discharge and demurrage time as follows: 65 hours and 45 minutes elapsed until the cargo was discharged at 0450 hours

on Monday, September 8, at San Diego. Adding to this figure the 14 hours and 20 minutes consumed by the discharge at Richmond, the total time expended in unloading cargo was 80 hours and 5 minutes. When the 24-hour free time is subtracted, it appears that defendant is liable for 56 hours and 5 minutes of demurrage. Since the contract calls for the payment of demurrage "at the rate of $1,800.00 per day or fraction thereof * * *," defendant is responsible for three days of demurrage, which amounts to $5,400.

The trial court found that "[p]laintiff saved in costs and expenses $2,800.00 or more by delay of voyage while tug Kokua was undergoing repairs and not being required to bring a substitute tug to Portland, Oregon, from Coos Bay, Oregon." The court ordered this amount deducted from the award of demurrage, and this order is the basis of plaintiff's second assignment of error.

In its answer, defendant did not plead a setoff or counterclaim or otherwise request this reduction of plaintiff's judgment. At the time the court made its order, the court stated that this amount was not a counterclaim or a setoff, but that "it is just because I feel that we are talking about purely liquidated damages. How is Sause Bros. damaged? * * *." Even if we assume that a demurrage charge represents liquidated damages for the delay of plaintiff's vessels, the court was not at liberty to allow a setoff to the amount of demurrage without some basis for this action in defendant's pleading. In *State ex rel Dean v. Dean,* 136 Or 694, 697, 300 P 1027, 1028 (1931), this court stated:

"It is a well-settled principle of law that a de-

cree or judgment on a matter outside the issue raised by the pleadings is a nullity * * *."

Whether the court's reduction of plaintiff's recovery is labeled a setoff, counterclaim, recoupment, or any other form of counterdemand, it is void unless it is based on allegations set forth in the answer, as required by ORS 16.290 (2)(b). The court erred in subtracting the sum of $2,800 from plaintiff's judgment.

■ The defendant's cross-appeal contends "[t]he circuit court erred in not finding judgment for the defendant."

The argument on the assignment of error makes no reference to the evidence by "appropriate designation of pages of the transcript or narrative statement," as required by Rule 2.50 of this court. The argument merely states:

"The trial court's findings of fact No. 1 through 11 require as a conclusion of law that judgment be rendered for defendant. * * *"

It is odd that defendant would make such a contention as the trial court file shows that defendant prepared the findings of fact and conclusions of law and judgment for the court's signature. We find no merit in this cross-appeal.

■ This is an action at law. However, it is clear from the foregoing discussion of the facts that the transcript of evidence contains all of the facts from which the items of damages may be determined under the terms of the contract between the parties. Therefore, pursuant to Art VII, § 3 (Amended), of the Constitution of Oregon, the case is remanded with instructions that judgment be entered in favor of plain-

tiff and against defendant in the sum of $5,400 (*Carolina Casualty v. Oregon Auto.,* 242 Or 407, 418, 408 P2d 198 (1966)), together with interest from the date judgment was entered in the trial court. *Pearson v. Schmitt,* 260 Or 607, 492 P2d 269 (1971).

Modified.